IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR AN ORDER AUTHORIZING THE
INITIAL INTERCEPTION OF WIRE               Case No._____      **3:20-MC-32**
AND ELECTRONIC COMMUNICATIONS              UNDER SEAL
TO AND FROM SPRINT CORP.
CELLULAR NUMBER (540) 327-0261 **(TP2)**
AND THE CONTINUED INTERCEPTION OF
ELECTRONIC COMMUNICATIONS
FOR FACEBOOK ACCOUNT IDS
100000756809234 **(FB1)** AND
100003308781682 **(FB2)**

## AFFIDAVIT IN SUPPORT OF APPLICATION

1. I, Patrolman Mathew Custer, Special Federal Officer deputized by the Department of Justice, being duly sworn, depose and state that:

2. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3. I have been an Officer with the Ranson Police Department since August 2007. I have received basic drug, gang, and criminal enterprise investigative training at the West Virginia State Police Academy located in South Charleston, West Virginia. Since July 2017, I have been assigned to work on the Eastern Panhandle Drugs and Violent Crimes Task Force ("EPD&VCTF"), and I am deputized by the U.S. Department of Justice, Federal Bureau of Investigation as a "Special Federal Officer." Prior to my current assignment, I was assigned to work as a uniformed Officer at the Ranson Police Department.

1

4. As a uniformed officer, I conducted criminal and drug investigations. Through my experience, I have become associated with drug dealers and users. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed; the methods of arranging drug transactions; the methods of payment for such drugs; the possession and use of firearms in connection with the trafficking of such drugs; and the manner in which narcotics traffickers store and conceal the proceeds of their illegal activities.

5. I have conducted multiple drug enterprise investigations in which Title –III interception authority has been sought and obtained. To date, I have participated in numerous Title-III investigations that have been approved and authorized in the Northern District of West Virginia ("NDWV"). My experience includes, but is not limited to, conducting surveillance, interviewing witnesses, conducting database checks, analyzing telephone records, writing affidavits for search warrants, executing search warrants, and working with undercover agents and informants.

6. Through my training and experience, I have become familiar with the methods of operations typically utilized by individuals who distribute drugs. I know that it is common practice for drug traffickers to routinely utilize telephones, mobile phones, prepaid phones, calling cards, public telephones, text messaging, counter-surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from the detection of law enforcement. Moreover, it is not unusual for them to initiate such mobile or prepaid phone service in the name of an associate or family member or in the name of a fictitious individual. The individuals often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the

2

concealment of proceeds derived from the sale of controlled substances. Through my training and experience, I have also become familiar with drug traffickers utilizing social media and multimedia messaging applications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from the detection of law enforcement.

## PURPOSE OF AFFIDAVIT

7. This Affidavit is being submitted in support of an application for an order authorizing the interception of wire communications, including any voicemail messages intercepted as they are contemporaneously left or retrieved, and the interception of electronic communications including, but not limited to, text messages, images, video, and attachments sent from, received by, including but not limited to: Facebook Messenger messages; private messages; chats; deleted messages; draft messages; all other communications and messages made or received; Wall postings; comments; status updates; links to photographs, articles, and other items; event postings; "check ins;" and pending "Friend" requests of MICHAEL CHRISTIAN, MISTY JACKSON, MICHAEL BROWN, MICHAEL MOODY, SAMANTHA ENGLE, MICHAEL PENDLETON, WILLIAM REDMAN, SHANE DIRTING, JOSHUA RUNKLES, JUSTIN CLINTON, JAIME CODDINGTON, KEONTA FRYE, UNSUB 6345 and other persons as yet unknown ("TARGET INTERCEPTEES") occurring to and from the following cellular telephone and Facebook Accounts:

   a. Cellular telephone bearing the number (540) 327-0261, and accessed through International Mobile Subscriber Identity (IMSI) number 312530013954685 ("TARGET PHONE 2" or (**TP2**)), subscribed to MISTY JACKSON with subscriber address of 1084 S. Laurel Rd. London, KY 40744, serviced by Sprint Corp. and used by JACKSON. (This address is associated with the Sprint Headquarters);

b. Facebook account # 100000756809234 (**FB1**) being used by MICHAEL CHRISTIAN. A grand jury subpoena was sent to Facebook to obtain FB1 account information. The name provided for the account is listed as "Michael Christian". FB1 account activation is listed as December 23, 2010; and

c. Facebook account # 100003308781682 (**FB2**) being used by MISTY JACKSON. A grand jury subpoena was sent to Facebook to obtain FB2 account information. The name provided for the account is listed as "Misty Rose". FB2 account activation is listed as January 8, 2012.[1]

8. **TP2** is being utilized by JACKSON for offenses involving violations of 18 U.S.C. § 2516; namely violations of 21 U.S.C. § 841, 21 U.S.C. § 843(b), 21 U.S.C. § 846, and 18 U.S.C. § 1952 (detailed later in this affidavit as the "TARGET OFFENSES").

9. **FB1** is being utilized by CHRISTIAN for offenses involving violations of 18 U.S.C. § 2516; namely violations of 21 U.S.C. § 841, 21 U.S.C. § 843(b), 21 U.S.C. § 846, and 18 U.S.C. § 1952 (detailed later in this affidavit as the "TARGET OFFENSES").

10. **FB2** is being utilized by JACKSON for offenses involving violations of 18 U.S.C. § 2516; namely violations of 21 U.S.C. § 841, 21 U.S.C. § 843(b), 21 U.S.C. § 846, and 18 U.S.C. § 1952 (detailed later in this affidavit as the "TARGET OFFENSES").

---

[1] TARGET FACEBOOK ACCOUNT 1 and TARGET FACEBOOK ACCOUNT 2 are referred to collectively as the "TARGET FACEBOOK ACCOUNTS."

4

11.     The authorization given applies to the target telephone number listed above (**TP2**), but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through that target telephone number referenced above, within the thirty-day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider(s), and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

12.     The authorization given applies to the TARGET FACEBOOK ACCOUNTS listed above (**FB1**) and (**FB2**). The authorization is also intended to apply to the TARGET FACEBOOK ACCOUNTS referenced above regardless of the device utilized to access the application.

13.     As a result of my personal participation in this investigation and reports made to me by other law enforcement officers and information obtained from confidential sources, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I declare that the facts contained in this Affidavit show that there is probable cause to believe that MICHAEL CHRISTIAN, MISTY JACKSON, MICHAEL BROWN, MICHAEL MOODY, SAMANTHA ENGLE, MICHAEL PENDLETON, WILLIAM REDMAN, SHANE DIRTING, JOSHUA RUNKLES, JUSTIN CLINTON, JAIME CODDINGTON, KEONTA FRYE, UNSUB 6345 (collectively the "TARGET SUBJECTS"), and others as yet unknown, have committed, are committing, and will continue to commit violations of:

  a.     21 U.S.C. § 841 – Possession with the intent to distribute and distribution of a controlled substance, namely "molly", "boot" (or MDMA) (a Schedule I controlled substance);

5

    b.    21 U.S.C. § 843(b) – Use of a communication facility to further the commission of a felony-controlled substance offense;

    c.    21 U.S.C. § 846 – Conspiracy to possess with the intent to distribute and to distribute controlled substances, namely "molly" (or MDMA) (a Schedule I controlled substance); and

    d.    18 U.S.C. § 1952 – Interstate travel in aid of unlawful activity. (collectively the "TARGET OFFENSES").

14.    Additionally, based upon the investigation in this case, there is probable cause to believe the following:

    a.    MICHAEL CHRISTIAN is using **FB1** in connection with the commission of the TARGET OFFENSES;

    b.    MISTY JACKSON is using **TP2** and **FB2** in connection with the commission of the TARGET OFFENSES;

    c.    particular wire and electronic communications of the TARGET INTERCEPTEES and others as yet unknown, concerning the TARGET OFFENSES will be obtained through the interception of wire and electronic communications occurring to and from **TP2**, electronic communications occurring to and from **FB1** and **FB2**;

    c.    the communications will likely identify and provide admissible evidence concerning:

        i.    the TARGET OFFENSES;

        ii.    the names, telephone numbers, Facebook users, and residences of associates of the Target Subjects, and others as yet unknown, including their drug supplier;

        iii.    the leadership of the drug trafficking organization;

        iv.    the dates, times, and places for commission of the illegal activities including drug distribution, and other related gang activity;

     v.    the location, receipt, administration, control, management, and disposition of United States currency, illegal narcotics, and assets to include business, vehicles, and items purchased with funds gained through the distribution of narcotics;

     vi.    the nature, scope, places, and methods of operation, to include drug storage locations; and

     vii.    the existence and location of records documenting the distribution of narcotics and gang-related activities.

15. Normal investigative procedures have been tried and have failed, appear unlikely to succeed if tried, or are too dangerous to employ, as described herein in further detail.

## BASIS OF INFORMATION

16. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

    a.    my experience investigating narcotics trafficking and gangs and criminal organizations;

    b.    oral and written reports, and documents about this investigation that I have received from members of the Federal Bureau of Investigation, local law enforcement, and other federal law enforcement agencies;

    c.    discussions I have had personally concerning this investigation with experienced criminal enterprise investigators;

    d.    physical surveillance conducted by the Federal Bureau of Investigation and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

7

  e.  public records;

  f.  telephone toll records, pen register and trap and trace information, telephone subscriber information;

  g.  Facebook account subscriber information and Facebook records associated with **FB1** obtained via search warrant;

  h.  precise location data received from search warrants;

  i.  statements of confidential sources; and

  j.  controlled purchases of "molly" from TARGET SUBJECT MICHAEL CHRISTIAN.

17. In addition to the foregoing, I specifically relied on oral reports/opinions from other law enforcement officers.

18. Since this Affidavit is being submitted for the limited purpose of securing authorization for the interception of wire and electronic communications, I have not included each and every fact known to me concerning this investigation or every aspect of the investigation to date. I have set forth only the facts that I believe are necessary to establish the foundation for probable cause for an order authorizing the interception of wire and electronic communications.

## TARGET SUBJECTS/TARGET INTERCEPTEES

19. Information about the TARGET SUBJECTS/TARGET INTERCEPTEES comes from the following sources and criminal indices: Confidential informant (CI) debriefings, law enforcement controlled narcotics purchases, physical surveillance conducted by law enforcement officers, information queries conducted through law enforcement databases and through commercial and public databases, through telephone records obtained via administrative subpoena, and Facebook records and content obtained via search warrant.

Through a review of that information, the following persons have been identified:

 a. MICHAEL CHRISTIAN, also known as "Big Mike" (herein referred to as "CHRISTIAN") has been identified by law enforcement officers to be utilizing telephone number 304-901-6899 (**TP1**) and Facebook Account 100000756809234 (**FB1**). CHRISTIAN is known to be residing in Berkeley County, West Virginia. CHRISTIAN has a date of birth of [Redacted] 1976, social security number of XXX-XX-5960, and FBI#: 928552AB0. CHRISTIAN's criminal history reflects multiple arrests for drug possession and distribution. He was convicted of possession with intent to distribute crack cocaine in March 2001 and sentenced to two to six years of incarceration with two years of probation to follow. In January 2001 CHRISTIAN was convicted of misdemeanor domestic battery. CHRISTIAN was federally convicted for distribution of cocaine in December 2012 and sentenced to 72 months of incarceration with 36 months of supervised probation to follow. The EPD&VCTF has conducted multiple controlled purchases of "molly" from CHRISTIAN over **TP1** and **FB1**, which are further detailed later in this affidavit.

 b. MISTY JACKSON (herein referred to as "JACKSON") has been identified by law enforcement officers to be utilizing telephone number 540-327-0261 (herein referred to as "Target Phone 2" or (**TP2**)) and Facebook account 100003308781682 (herein referred to as "Facebook Account 2" or (**FB2**)). JACKSON is known to be residing in Berkeley County, West Virginia with CHRISTIAN. In January 2019, investigators obtained a pen trap and trace order (3:20-MC-3) for **TP1**. An analysis of **TP1** revealed **TP2** to be a top caller of **TP1**. The subscriber information provided by the service provider, via subpoena, revealed **TP2** to be subscribed to JACKSON. A search through a public database revealed JACKSON provided her name and telephone number 540-327-0261 (**TP2**)

as the service number for utilities services listed on an address associated with her in Winchester, Virginia. JACKSON has been confirmed to be the user of **FB2** by visual observations of the publicly available profile images. At this point investigators are unable to determine if **TP2** is associated with **FB2**. JACKSON did not publicly list a telephone number with **FB2**, thus not allowing investigators to link **TP2** with **FB2**. JACKSON has a date of birth of ▮Redacted▮ 1987, social security number of XXX-XX-2006, and FBI#: 682918KC8.   JACKSON's criminal history reflects a felony conviction from May 2008 where she was convicted for unlawful wounding and sentenced to two years of supervised probation in lieu of two years of incarceration. JACKSON's criminal history has misdemeanor convictions related to drug possession and assault and battery.   JACKSON was convicted of possession of marijuana in February 2016. In October 2019, the EPD&VCTF conducted a law enforcement-controlled purchase of "molly" from Samantha ENGLE. The purported "molly" obtained in this law enforcement-controlled purchase was supplied to Samantha ENGLE by JACKSON. No surveillance of JACKSON was conducted after the controlled purchase.

c.  MICHAEL BROWN (herein referred to as "BROWN") is currently incarcerated at the Eastern Regional Jail in Martinsburg, West Virginia. Prior to his arrest, BROWN was residing at 1037 Aztec Drive in Martinsburg, Berkeley County, West Virginia. Investigators believe BROWN is the biological son of CHRISTIAN. BROWN has a date of birth of ▮Redacted▮/1995, social security number of XXX-XX-1539, and FBI#: 23462AE4.   BROWN's criminal history reflects multiple felony arrests related to possession with intent to distribute narcotics. In March 2016, BROWN was convicted for possession with intent to deliver a controlled substance and was sentence to 1 to 15 years of incarceration. In March 2016, BROWN was also convicted of malicious assault and was sentenced

10

to 5 to 18 years. In June 2016, BROWN was arrested of 2nd degree robbery, and he was later convicted and sentenced to 5 to 18 years of incarceration. In June 2016, BROWN was arrested for delivery of a controlled substance and was later convicted and sentenced to 1 to 15 years of incarceration. In June 2019, BROWN was arrested for three counts of possession with intent to deliver a controlled substance. The drugs seized in the June 2019 arrest returned from DEA analysis as fentanyl and Eutylone. Eutylone is a synthetic cathinone which is a schedule I controlled substance. In December 2019 BROWN's probation was revoked for his 2016 delivery of a controlled substance and 2nd degree robbery charges. BROWN is currently held on a probation violation, and he is not scheduled to be released until June 30, 2021.

d. MICHAEL MOODY, also known as "CHURCH" (herein referred to as "MOODY"), has been identified by law enforcement officers to be utilizing Facebook account 100033220051825 (herein referred to as "Conspirator Facebook 2" or (**CFB2**)). MOODY is known to be residing in Berkeley County, West Virginia.  MOODY has been confirmed to be the user of **CFB2** by visual observations of the publicly available profile images. MOODY has a date of birth of [Redacted] 1985, social security number of XXX-XX-3130, and FBI#: 155956RC8.  MOODY's criminal history reflects multiple felony arrests related to possession with intent to distribute narcotics and misdemeanor arrests for possession of marijuana. In May 2010, MOODY was arrested for possession with intent to distribute a controlled substance and was subsequently convicted of misdemeanor possession. In September 2015, MOODY was arrested for felony possession with intent to distribute a controlled substance which was subsequently dismissed. In May 2017, MOODY received a deferred adjudication sentence for a misdemeanor possession charge. In November 2017, MOODY was arrested for conspiracy to commit a felony against the

11

state which was subsequently dismissed. In July 2019, MOODY was arrested for conspiracy to commit a felony against the state which was subsequently dismissed by the request of EPD&VCTF.

e.   SAMANTHA ENGLE (herein referred to as "ENGLE") also known as "SAM or SAM DAWN," has been identified by law enforcement officers to be utilizing telephone number 304-995-3933 (herein referred to as "Conspirator Phone 2" or **CP2**), telephone number 304-350-9273 (herein referred to as "Conspirator Phone 4" or **CP4**) and Facebook Account "Samantha Hanna" with Facebook ID # 100043826723922 (herein referred to as "Conspirator Facebook 6 or **CFB6**). ENGLE has been confirmed to be the user of **CP2** through a law enforcement-controlled narcotics purchase. ENGLE has been confirmed to be the user of **CP4** via authorized electronic interception 3:20MC22 of **FB1**, where **CP4** was provided to CHRISTIAN over **TP1** by who investigators believe is ENGLE's daughter. This interception is further detailed in this affidavit. ENGLE has been confirmed to be the user of **CFB6** by visual observations of the publicly available profile images. At this point investigators are unable to determine if **CP2** is associated with **CFB6**. ENGLE did not publicly list a telephone number with **CFB6**, thus not allowing investigators to link **CP2** with **CFB6**. ENGLE is known to be residing in Berkeley County, West Virginia. ENGLE has a date of birth of ~~Redacted~~ /1983, a social security number of XXX-XX-7842, and FBI# 399136HD2. ENGLE's criminal history reflects multiple theft and assault charges with multiple failure to appear charges. In April 2009, ENGLE was convicted of misdemeanor battery and was sentenced to time served (approximately six days of incarceration). In December 2016, ENGLE was arrested and subsequently convicted of felony unlawful assault and was sentenced to 1 to 5 years of incarceration. In October 2019, ENGLE was arrested for obstructing an officer and for Grand Larceny. This case is still pending in

Jefferson County, West Virginia. To date, the EPD&VCTF have successfully completed one controlled buy from ENGLE, which is further detailed later in this affidavit.

f.  MICHAEL PENDLETON (herein referred to as "PENDLETON") has been identified by law enforcement officers to be utilizing the Facebook Account "Mike Smith" with Facebook ID # 100023376671789 (herein referred to as "Conspirator Facebook 3" or (**CFB3**) and Facebook Account "Mike Smith" with Facebook ID # 100041635115674 (herein referred to as "Conspirator Facebook 7 or **CFB7**)). PENDLETON is known to be residing in Berkeley County, West Virginia. PENDLETON has been confirmed to be the user of **CFB3** and **CFB7** by visual observations of the publicly available profile images. PENDLETON has a date of birth of ▓Redacted▓/1992, a social security number of XXX-XX-1944, and FBI# W2R3W75K6. PENDLETON's criminal history reflects multiple misdemeanor drug possessions and a domestic battery conviction. In January 2016, PENDLETON was convicted for cruelty to animals and was sentenced to 30 days' incarceration with two years' probation.  In January 2016, PENDLETON was convicted of misdemeanor drug possession and received a 30-day suspended jail sentence and two years' probation. In February 2017, PENDLETON was convicted for domestic battery and obstructing an officer. PENDLETON received a suspended 60-day sentence with 1 year of unsupervised probation.  In May 2018, PENDLETON was convicted of misdemeanor drug possession and sentenced to time served. PENDLETON's criminal history does not advise the type of drugs seized during this arrest. PENDLETON is currently wanted out of Frederick County, Virginia for failure to appear on misdemeanor shoplifting charges.  The warrant is for in-state pick up only.

g.  WILLIAM REDMAN (herein referred to as "REDMAN") has been identified by law enforcement officers to be utilizing Facebook Account "William Redman" with Facebook ID# 100030288108466 (herein referred to as "Conspirator Facebook 4" or (**CFB4**)). REDMAN is known to reside in Berkeley County, West Virginia. REDMAN has been confirmed to be the user of **CFB4** by way of visual observations of the publicly available profile images. REDMAN has a date of birth of Redacted 1966, social security number XXX-XX-3904, and FBI# 330727PA5. REDMAN's criminal history reflects multiple felony convictions related to drug distribution and possession with intent to distribute. In June 1990, REDMAN was convicted of possession with intent to distribute cocaine in the state of Virginia. In March 2003, REDMAN was federally convicted for the distribution of crack cocaine and was sentenced to 151 months of incarceration with three years' supervised release. In May 2014, REDMAN was federally convicted of a probation violation and sentenced to 12 months and 1 day of incarceration. In September 2015, REDMAN was federally convicted of a probation violation and was sentenced to 364 days of incarceration. In October 2019, REDMAN was indicted by the Berkeley County Grand Jury for distribution of Fentanyl, an EPD&VCTF investigation. On December 5, 2019, REDMAN was involved in a vehicle pursuit where he was found to be in possession of a firearm. REDMAN was arrested for a failure to appear for the above indictment, fleeing with reckless indifference, and felon in possession of a firearm. In February 2020, the EPD&VCTF conducted a controlled purchase of "molly" and heroin from REDMAN.

h.  SHANE DIRTING (herein referred to as "DIRTING") has been identified by law enforcement officers to be utilizing Facebook Account "Shane Dirting" with Facebook ID# 100007735899716 (herein referred to as "Conspirator Facebook 5" or **CFB5**). DIRTING is known to reside in

Berkeley County, West Virginia. DIRTING has been confirmed to be the user of **CFB5** by visual observations of the publicly available profile images. DIRTING has a date of birth of ▓1966, social security number XXX-XX-2203, and FBI# 158836DD2. DIRTING's criminal history reflects misdemeanor arrests for brandishing a weapon and contributing to the delinquency of a minor.

i.  JOSHUA RUNKLES (herein referred to as "RUNKLES") is known to reside in Berkeley County, West Virginia. RUNKLES has a date of birth of ▓/1984, social security number XXX-XX-7316, and FBI# 304899DC2. In October 2019, RUNKLES was contacted by a cooperating individual where RUNKLES furnished the cooperating individual with a telephone number (304-901-6899 (**TP1**)) for CHRISTIAN. RUNKLES has a criminal history that reflects multiple felony arrests for drug distribution and possession. In August 2014, RUNKLES was convicted for felony possession of a Schedule I or II controlled substance and was given a 2-year suspended sentence. In June 2019, RUNKLES was arrested for distribution of a controlled substance and conspiracy in Berkeley County, WEST VIRGINIA. In September 2019, RUNKLES was arrested on two counts of possession of a controlled substance.

j.  JUSTIN CLINTON (herein referred to as CLINTON) was known to reside in Berkeley County, West Virginia. CLINTON has a date of birth of ▓1994, a Social Security number of XXX-XX-9719, and a FBI# of 764742WD5. CLINTON's criminal history reflects felony convictions for breaking and entering and nighttime burglary. CLINTON is currently on supervised probation. During the authorized interception of **FB1** and **FB2** (3:20-MC-22), CLINTON was positively identified as the user of Facebook account 100000176581422 (herein referred to **CFB8**). CLINTON has been

confirmed to be the user of **CFB8** by visual observations of the publicly available profile images. On March 17, 2020, wire monitors intercepted communications with **CFB8** and **FB1** where it is believed CLINTON was purchasing narcotics from CHRISTIAN. Surveillance was conducted during the meeting of CHRISTIAN and CLINTON and investigators further confirmed CLINTON to be the user of **CFB8**.

k. JAIME CODDINGTON (herein referred to as CODDINGTON) is known to reside in Berkeley County, West Virginia. CODDINGTON has a date of birth of [Redacted] /1986, a Social Security number of XXX-XX-1739, and a FBI# of 382658VC7. CODDINGTON's criminal history reflects felony drug distribution convictions. CODDINGTON's criminal history reflects a probation violation on 07/27/2015. CODDINGTON has been confirmed to be the user of Facebook account 100036922627320 (herein referred to as **CFB9**). CODDINGTON has been confirmed to be the user of **CFB9** by visual observations of the publicly available profile images. On March 18, 2020, wire monitors intercepted communications with **CFB9** and **FB1** where it is believed CODDINGTON was requesting CHRISTIAN to supply her with narcotics.  Surveillance was conducted during the meeting of CHRISTIAN and CODDINGTON and investigators further confirmed CODDINGTON to be the user of **CFB9**. During this surveillance, investigators observed CODDINGTON to be occupying a vehicle that is frequently utilized by DIRTING.

l. KEONTA FRYE (herein referred to as FRYE) is known to reside in Berkeley County, West Virginia. FRYE has a date of birth [Redacted] 1993, a Social Security number of XXX-XX-3061, and a FBI# of 995414TD1. FRYE's criminal history reflects misdemeanor shoplifting convictions with the most recent conviction on 10/16/2018. FRYE has been identified

by law enforcement officers to be utilizing telephone number 304-702-6791 (herein referred to as "Conspirator Phone 3" or **CP3**) by way of subpoena and Facebook account 1821306724 (herein referred to as **CFB10**). FRYE has been confirmed to be the user of **CFB10** by visual observations of the publicly available profile images. On March 18, 2020, wire monitors intercepted communications with **CFB10** and **FB2** where it is believed JACKSON is requesting to be supplied prescription pain medication by FRYE. This communication is further detailed in this affidavit. Surveillance was conducted during the meeting of FRYE and JACKSON and investigators further confirmed FRYE to be the user of **CFB10**.

m. "Lindsay Pepple" (herein referred to as UNSUB 6345) has yet to be fully identified. UNSUB 6345 is known to use Facebook account 100048899346345 Lindsay Pepple (herein referred to as **CFB11**). Investigators are able to view some publicly available profile images associated with this account. Investigators compared these images with publicly available images associated with **CFB6**. While viewing **CFB6**, Investigators observed ENGLE referring to UNSUB **6345** as her daughter. Although this information is useful, investigators are unable to fully identify UNSUB 6345 as it is common for individuals to use false names and/or aliases for their Facebook account identification.

## PRIOR APPLICATIONS

20.   On April 1, 2020, the electronic surveillance indices of the Federal Bureau of Investigation, the Drug Enforcement Administration, and the Department of Homeland Security/Homeland Security Investigations were checked. There

17

have been no prior applications seeking court authorization to intercept the wire, oral, or electronic communications of the TARGET SUBJECTS/TARGET INTERCEPTEES or involving the TARGET TELEPHONE/TARGET FACEBOOK ACCOUNTS other than what is detailed below.

a. On March 11, 2020, the United States District Court for the Northern District of West Virginia issued an order (3:20-MC-22) authorizing the interception of wire and electronic communications to and from a cellular telephone bearing the number 304-901-6899, used by MICHAEL CHRISTIAN. Further, the United States District Court for the Northern District of West Virginia issued an order (3:20-MC22) authorizing the interception of electronic communications to and from Facebook Account's 100000756809234 (**FB1**) AND 100003308781682 (**FB2**). MICHAEL CHRISTIAN, MISTY JACKSON, JAIME CODDINGTON, MICHAEL PENDLETON, and JUSTIN CLINTON, identified as TARGET SUBJECTS in the instant affidavit, were intercepted over the Facebook Account's. Interceptions are scheduled to terminate on April 10, 2020. No TARGET SUBJECTS were intercepted over **TP1** except for one outgoing electronic communication from CHRISTIAN to **TP2** but it was never sent due to the phone having insufficient funds. This outgoing communication was an image pertaining to opioid addiction.

## SOURCES OF INFORMATION

21. Special Agents of the Federal Bureau of Investigation and local officers have received information concerning the illegal drug trafficking activities of members of the criminal enterprise.

22. CI-BLUE: Confidential Informant "BLUE" (CI-BLUE) began cooperating with the EPD&VCTF in October 2019 and provided information regarding the

instant investigation.   CI-BLUE was motivated to cooperate and provide assistance to law enforcement authorities for consideration in a pending criminal matter.   CI-BLUE provided the EPD&VCTF with information pertaining to a murder that took place in March 2019 in Martinsburg, West Virginia. CI-BLUE was familiar with target subjects of a drug trafficking organization (DTO), specifically TARGET SUBJECTS ENGLE and CHRISTIAN. CI-BLUE was able to make contact with ENGLE to negotiate a law enforcement-controlled purchase of drugs. The information provided by CI-BLUE was later corroborated through consensually monitored communications. After conducting law enforcement-controlled purchases from ENGLE, CI-BLUE gained information pertaining to CHRISTIAN along with a telephone number (**TP1**) and Facebook account (**FB1**) for CHRISTIAN. CI-BLUE was able to make contact with CHRISTIAN via **TP1** and **FB1**. CI-BLUE was able to successfully conduct controlled purchase of "molly" from CHRISTIAN over **TP1** and **FB1**. CI-BLUE has an adult criminal history reflecting criminal acts including prohibited person of a firearm, assault and battery, disorderly conduct, and distribution of a controlled substance.   CI-BLUE's adult criminal history does not include deception-related offenses. Information provided to the EPD&VCTF by CI-BLUE was determined to be gleaned from first-hand interaction with target subjects of this investigation. Within the context of the information provided by CI-BLUE, which was detailed and relied upon for purposes of this application, law enforcement believes the confidential source is credible and his/her information is reliable.

## FACTS ESTABLISHING PROBABLE CAUSE

23.   In this affidavit, I seek permission to initiate the interception of wire and electronic communications over the TARGET TELEPHONE (**TP2**), continue the interception of electronic communications occurring over the TARGET FACEBOOK ACCOUNTS, in order to further uncover the scope of the DTO's

drug trafficking activities. In particular, the interception of the TARGET TELEPHONE (TP2) and the TARGET FACEBOOK ACCOUNTS will enable investigators to establish identifying information for the source of drug supply for the TARGET SUBJECTS, the location of "stash houses" being utilized by the TARGET SUBJECTS, the methods being utilized by the TARGET SUBJECTS to conceal drug proceeds, and to disrupt and dismantle this violent, drug trafficking organization. It is requested that the affidavit accompanying the authorization (3:20MC22) to intercept **TP1**, **FB1** and **FB2** be incorporated into this instant affidavit.

24.     During the course of the investigation, the EPD&VCTF has identified TARGET SUBJECTS MICHAEL CHRISTIAN, MISTY JACKSON, MICHAEL BROWN, MICHAEL MOODY, SAMANTHA ENGLE, MICHAEL PENDLETON, WILLIAM REDMAN, SHANE DIRTING, JOSHUA RUNKLES, JUSTIN CLINTON, JAIME CODDINGTON, KEONTA FRYE, and UNSUB 6345 to be conspiring with each other as well as with others to engage in drug trafficking and violent acts in and around the Eastern Panhandle of West Virginia.

25.     On March 9, 2019, the West Virginia State Police ("WVSP") responded to a call for a home invasion in Berkeley County, West Virginia. The WVSP identified a male victim, Joshua CASE, who had been shot. The murder investigation revealed multiple suspects entered CASE's residence with the purpose of robbing him. A fight ensued between the suspects and CASE, and the suspects shot CASE. Case later died as a result of the gunshot wound. The suspects were arrested and are awaiting their criminal trial in Berkeley County, West Virginia. The suspects have not been identified as being associated with BROWN. This investigation by the WVSP and EPD&VCTF identified CASE as a "molly" dealer who sold drugs in the Northern District of West Virginia more specifically in Martinsburg, West Virginia. Law enforcement learned the identity of CASE's drug supplier, "MIKE B," from witnesses' accounts and the

forensic download of CASE's phone. "MIKE B" was later identified as Michael BROWN.

26.     On Monday, March 11, 2019, the mother of CASE's girlfriend contacted the EPD&VCTF to advise she located a baggie of an unknown substance in a clothing article that belonged to CASE. Investigators traveled to her residence and recovered the suspected drugs. Investigators believed the recovered substance was what is being sold as "molly."

27.     The identification of BROWN as CASE's drug supplier lead the EPD&VCTF to further investigate BROWN's criminal enterprise. BROWN was identified as residing in Martinsburg, West Virginia. The EPD&VCTF was able to install a fixed camera in a location where BROWN's residence could be observed. The camera was useful in identifying multiple vehicles. The camera revealed a moving truck at this location and it was determined BROWN was in the process of moving to a new, unknown location. The camera failed to identify the source of drugs or confirm if drugs were being sold from the residence.

28.     On June 15, 2019, Martinsburg Police Department ("MPD") arrested BROWN after they received a drug complaint within the city limits of Martinsburg, West Virginia. Officers conducted a search of BROWN's person and identified a large amount of U.S. currency and a redistributable quantity of drugs concealed in his underwear near his crotch area. The drugs were sent to the DEA Laboratory where the drugs were identified as fentanyl and Eutylone, a Schedule I controlled substance. During the arrest, BROWN failed to cooperate with MPD officers and failed to obey their commands.

29.     After BROWN was arrested, TFOs traveled to the Eastern Regional Jail (ERJ) and attempted to interview BROWN in reference to the distribution of drugs to CASE and CASE's murder investigation. During the interview, BROWN

21

refused to cooperate and at one point turned around and faced the opposite direction. This interview failed to further this investigation. BROWN is currently held on a probation violation, and he is not scheduled to be released until June 30, 2021.

30.  In October 2019, the EPD&VCTF obtained information from CI-BLUE that ENGLE was believed to be conspiring with CHRISTIAN to distribute "molly," a/k/a "boot," a/k/a MDMA, around Martinsburg, West Virginia. It was believed that CHRISTIAN supplied drugs to ENGLE for redistribution. In an effort to identify CHRISTIAN's source of "molly" supply and disrupt their ability to traffic narcotics to the Eastern Panhandle of West Virginia, the EPD&VCTF attempted to make controlled purchases of "molly" from ENGLE and CHRISTIAN.

31.  Between October 18, 2019, and February 6, 2020, the EPD&VCTF conducted controlled drug purchases from CHRISTIAN and/or JACKSON and/or ENGLE and/or REDMAN utilizing a confidential informant(s). This information is further detailed in the initial intercept order for **TP1**, **FB1**, and **FB2** under case number 3:20-MC-22.

32.  On January 8, 2020, the EPD&VCTF obtained a PEN trap and trace for telephone number 304-901-6899 (**TP1**). The PEN order was signed by Magistrate Judge Robert W. Trumble in the Northern District of West Virginia in case number 3:20-MC-3.

33.  On January 8, 2020, the EPD&VCTF obtained a Facebook PEN trap and trace for **FB1** which was signed by Magistrate Judge Robert W. Trumble in the Northern District of West Virginia in case number 3:20-MC-4.

34.    On January 9, 2020, the EPD&VCTF obtained a vehicle tracker for the vehicle being utilized by CHRISTIAN and JACKSON, a 2008 Chevrolet Equinox bearing West Virginia registration 44H648 (**TV1**) registered to BROWN in the Norther District of West Virginia in case number 3:20-MJ-2.

35.    On January 9, 2020, the EPD&VCTF sought and obtained a GPS geolocation search warrant in the Northern District of West Virginia (3:20-MJ-3) for CHRISTIAN's cell phone (**TP1**).

36.    On January 9, 2020, the EPD&VCTF obtained a Facebook search warrant for **FB1** in the Northern District of West Virginia in case number 3:20-MJ-4 signed by Magistrate Trumble.

37.    On January 11, 2020, investigators submitted the Facebook search warrant (3:20-MJ-4) to Facebook through the law enforcement portal. The search warrant results were returned on January 23, 2020.

38.    On January 11, 2020, investigators located **TV1** parked in the driveway of 1037 Aztec Drive in Martinsburg, Berkeley County, West Virginia. Officers were aware CHRISTIAN resided at this residence with JACKSON. At approximately 0320 hours, investigators installed a vehicle tracker on **TV1**. On March 10, 2020 investigators attempted to conduct maintenance on the tracker installed on TV1. Investigators drove to 1037 Aztec Drive in Martinsburg, Berkeley County, West Virginia and observed a 2011 Chevrolet Malibu bearing VA temporary registration 71199Z (herein referred to as **TV2**) parked in the driveway. Investigators conducted a registration check on **TV2** and learned it was registered to Misty Rose Jackson.

39.    On January 22, 2020, investigators monitored the tracker GPS previously installed on **TV1**. The **TV1** vehicle tracker indicated CHRISTIAN was traveling

towards Maryland via Rt. 340. The EPD&VCTF arranged with the West Virginia State Police (WVSP) to conduct a traffic stop on CHRISTIAN upon his return. A traffic stop was conducted and no drugs were located. CHRISTIAN provided **TP1** as his contact to the WVSP during this traffic stop.

40. On January 23, 2020, investigators obtained the Facebook **(FB1)** search warrant results. In the search warrant, investigators requested Facebook to supply investigators with CHRISTIAN's Facebook history ranging in dates from January 9, 2019 to January 9, 2020. Investigators reviewed the search warrant results and observed conversations between TARGET SUBJECTS and CHRISTIAN where it is believed the TARGET SUBJECTS were requesting to be supplied drugs from CHRISTIAN. A review of the Facebook records for FB1 identified as being utilized by CHRISTIAN to distribute drugs to the TARGET SUBJECTS and others not yet identified. This review is detailed further in case number 3:20-MC-22.

41. Through debriefings and investigation, investigators believe CHRISTIAN travels to the Washington D.C. area to his source of supply. Investigators have been able to monitor the GPS tracker installed on **TV1** and has observed **TV1** travel to Capitol Heights, Maryland on January 13, January 18, January 22, and February 4, 2020.   Prior to and during those travels, investigators monitored the active PEN for **TP1** and **FB1**. Upon **TV1**'s return to Berkeley County, West Virginia, **TV1** would travel to CHRISTIAN's residence and then travel to Winchester, Virginia (located in the Western District of Virginia) to what officers believe is the stash location for CHRISTIAN. Investigators have identified the apartment complex in Winchester, Virginia where CHRISTIAN travels to. However, efforts to conduct surveillance have not revealed the identity of the apartment CHRISTIAN associates with. CHRISTIAN has been identified as parking in the visitor's section of the apartment complex.

Investigators were able to identify a location in Winchester, Virginia that was suitable for fixed video surveillance that would allow investigators to observe CHRISTIAN and/or JACKSON arrive at the target location. Fixed video surveillance was installed at this location on March 4, 2020. Investigators have monitored this video surveillance and have observed CHRISTIAN and JACKSON utilizing **TV1** and **TV2** to come and go from this location. Investigators observe JACKSON to enter an apartment building. Once inside, investigators are unable to determine the reasoning for CHRISTIAN and/or JACKSON's visit at this location. Although the fixed video surveillance has been beneficial to the investigation, it has failed to identify the individuals CHRISTIAN and JACKSON are visiting and the reasoning for their visits.

42. On February 6, 2020, the EPD&VCTF utilized a confidential source to successfully make a law enforcement-controlled purchase of $130 of "molly" and $200 worth of heroin from REDMAN. The law enforcement controlled-purchase was initiated with a consensually recorded and monitored Facebook message over **CFB4**. The suspected "molly" and heroin was taken into custody of the EPD&VCTF and sent to the West Virginia State Police Laboratory for analysis. To this date, an analysis has not been returned from the West Virginia State Police Laboratory. A preliminary test of the purported "molly" resulted in the substance to be N-ethylpentylone. N-ethylpentylone is a substituted cathinone and stimulant drug which is a Schedule I controlled substance.

43. On February 24, 2020, the EPD&VCTF sought and obtained a PEN trap and trace for **TP2** which was signed by Magistrate Judge Robert W. Trumble in the Northern District of West Virginia in case number 3:20-MC-15.

44. During the week of February 24, 2020, investigators observed a diminished call volume on **TP1**. Investigators contacted SPRINT and learned **TP1** was in

suspended status due to non-payment. Although **TP1** was in suspended status, CHRISTIAN could re-activate **TP1** at any time.

45.   On February 25, 2020, investigators monitored the court authorized pen trap and trace for **TP1** (3:20-MC-3) and observed that CHRISTIAN had made an outgoing call. Investigators believed this showed **TP1** was going to be used.

46.   On February 28, 2020, the EPD&VCTF sought and obtained a Facebook PEN trap and trace for **FB2**, which was signed by Magistrate Judge Robert W. Trumble in the Northern District of West Virginia in case number 3:20-MC-19.

47.   On March 10, 2020, the EPD&VCTF obtained a vehicle tracker for TV2 in the Northern District of West Virginia in case number 3:20-MJ-15. To date, a tracker has not been installed on **TV2** due to the risk of jeopardizing this investigation.

48.   On March 11, 2020, the EPD&VCTF sought and obtained authorization (3:20MC22) in the Northern District of West Virginia to intercept wire and electronic communications of **TP1**, and electronic communications over **FB1** and **FB2**. Interception of **FB1** and **FB2** has revealed that CHRISTIAN and JACKSON are distributing narcotics in the Northern District of West Virginia, which is further detailed in this affidavit. Interception of **FB1** and **FB2** has revealed that CHRISTIAN and JACKSON are in communication with PENDLETON, DIRTING, CODDINGTON, CLINTON, and others yet to be fully identified, to distribute a schedule I controlled substance with a street name of "boot."

26

49. During the initial interception of **TP1**, investigators observed a diminished call volume over **TP1** and thus failed to further this investigation. Although **TP1** had a diminishing call volume, the pen trap and trace order revealed **TP2** was now communicating with TARGET SUBJECTS associated with **TP1**.

50. The interceptions for **FB1** and **FB2** have been useful in identifying re-distributors of drugs who are purchasing it from CHRISTIAN and/or JACKSON.

51. On March 15, 2020 investigators monitoring communications occurring over **FB2** intercepted messages from CLINTON (**CFB8**) where CLINTON is asking JACKSON **FB2** to advise CHRISTIAN **FB1** to meet him at a desired location and CLINTON would supply CHRISTIAN with $120 US currency. During the text conversation, JACKSON calls CLINTON several times. This communication is not intercepted and investigators are unable to determine the context of those voice calls (those voice calls are identified in the below verbatims). During the text conversation, CLINTON speaks of redistributing narcotics. Wire monitors also intercepted communication where JACKSON is requesting to purchase prescription pain medication and asks CLINTON to locate the medication for her. During this conversation, CLINTON and JACKSON communicate through Facebook voice calls. Although investigators are unable to determine the content of these calls, investigators believe they are used to further arrange the distribution of drugs. Before and after the voice calls, the intercepted conversation reveals drug talk. The timing of these calls further leads investigators to believe that the voice calls are not used to speak about a separate subject but only used to further the distribution of narcotics. The verbatim conversation, with the order of the voice calls, is below with investigator notes in italics:

CLINTON (**CFB8**):   can u tell pops my girl bout to shower then ima have yall meet me by brothers pizza ill have 120 *(Investigators believe CLINTON is contacting JACKSON and requesting CHRISTIAN to meet him so that he can be supplied narcotics by JACKSON and CHRISTIAN. CLINTON advises he has the $120)*

JACKSON (**FB2**) makes a voice call over Facebook to CLINTON (**CFB8**)

JACKSON (**FB2**) makes a voice call over Facebook to CLINTON (**CFB8**)

CLINTON (**CFB8**) makes a voice call over Facebook to JACKSON (**FB2**)

CLINTON (**FB2**):   ima scoop the bread *(CLINTON is advising he will go get the money)*

CLINTON (**CFB8**):   meet me at the train stations *(CLINTON advises JACKSON where to meet him)*

CLINTON (**CFB8**):   I jus told the bitch so she jus gonna give me the bread *(CLINTON had a conversation with an unknown female and advised he will obtain money from her)*

JACKSON (**FB2**):   ok

CLINTON (**CFB8**) makes a phone call over Facebook to JACKSON (**FB2**)

CLINTON (**CFB8**):   got me all worried an shit ima get her bread then meet u so its just me *(CLINTON further advises that he will obtain the money and when JACKSON and CHRISTIAN meet him, CLINTON will be alone)*

CLINTON (**CFB8**):   im glad u called me *(CLINTON confirms JACKSON called him)*

CLINTON (**CFB8**):   getting the bread now fam *(CLINTON advises he is obtaining the money now)*

CLINTON(**CFB8**):   u know I don't move hot *(CLINTON advises he does not travel with narcotics on his person)*

CLINTON (**CFB8**):   can I bust this so I make more money cause she trynna get a deal ill have the 100 in like an hour *(Investigators believe CLINTON is asking permission to break apart the narcotics he is about to receive from JACKSON and CHRISTIAN so that he can sell at a larger profit)*

JACKSON (**FB2**) makes a voice call over Facebook to CLINTON (**CFB8**)

CLINTON (**CFB8**):   bout to pull up

CLINTON (**CFB8**):   u wanna take me to this 40 an I give u the 40 an I got couple other little swerves that my peoples gonna pull up *(CLINTON advises he has some of the drugs sold and asks if JACKSON wants to drive him to distribute the drugs. CLINTON advises he will pay JACKSON $40)*

JACKSON (**FB2**) makes a voice call over Facebook to CLINTON (**CFB8**)

CLINTON (**CFB8**):   I got u pops *(CLINTON uses the term "pops" and investigators believe he spoke with CHRISTIAN over **FB2** on the previous voice call)*

JACKSON (**FB2**): can u get any erks *(JACKSON is asking CLINTON if he can obtain prescription pain medication for her)*

CLINTON (**CFB8**): I can look hold up *(CLINTON advises JACKSON that he will attempt to locate prescription pain medication)*

JACKSON (**FB2**): ight

CLINTON (**CFB8**): what kind *(CLINTON is inquiring what prescription pain medication JACKSON is requesting)*

JACKSON (**FB2**): don't matter *(JACKSON isn't set on a certain prescription pain medication and would take what ever is available)*

JACKSON (**FB2**): whatever

CLINTON (**CFB8**): ite bet give me a sec

CLINTON (**CFB8**) makes a phone call over Facebook to JACKSON (**FB2**)

CLINTON (**CFB8**): I got that too but my mans waiting on the erkys still *(CLINTON speaks of context that investigators believe was discussed over the voice call)*

52. On March, 16, 2020, investigators monitoring communications occurring over **FB1** intercepted messages from CLINTON (**CFB8**) where CLINTON is advising CHRISTIAN (**FB1**) where CLINTON is requesting to meet up with CHRISTIAN. CLINTON advises he will be obtaining money and would also have the money owed to CHRISTIAN for what investigators believe is related to a previous drug sale. At the end of the text conversation, CHRISTIAN makes a voice call over **FB1** to CLINTON. This communication is not intercepted and investigators are unable to determine the context of those voice calls (those voice calls are identified in the below verbatims). Although investigators are unable to determine the content of these calls, investigators believe they are

used to further arrange the distribution of drugs. Before the voice call, the intercepted conversation reveals drug talk. The timing of this call further leads investigators to believe that the voice call is not used to speak about a separate subject but only used to further the distribution of narcotics. The verbatim conversation is below with investigator notes in italics:

CLINTON (**CFB8**): ill be around the way like 430-5 at my girls then my friends scoopin an they got 60 clips an I got that for you too (*CLINTON advises CHRISTIAN where he will be and that he will be obtaining money so that he could obtain drugs from CHRISTIAN. CLINTON advises he has money for CHRISTIAN*)

CHRISTIAN (**FB1**): Ok I'll be there (*CHRISTIAN agrees to meet with CLINTON*)

CLINTON (**CFB8**): u gucci? (*CLINTON ascertains whether or not CHRISTIAN can supply drugs to CLINTON*)

CHRISTIAN (**FB1**): Nu I need that it be tomorrow (*CHRISTIAN advises he needs to money from CLINTON and that he will have drugs the following day (March 17, 2020)*)

CLINTON (**CFB8**): ite

CHRISTIAN (**FB1**): Way (*Investigators believe this is a typo and CHRISTIAN meant to text "wya" which is a text acronym for "where you at"*)

31

CLINTON (**CFB8**):      im at my girls out summit point once she brings me home I got u *(CLINTON advises CHRISTIAN of his location and that he will pay CHRISTIAN when he gets to CLINTON's house)*

CHRISTIAN (**FB1**) makes a voice call over Facebook to CLINTON (**CFB8**)

53.   On March 17, 2020, investigators monitoring communications occurring over **FB1** intercepted messages from CHRISTIAN (**FB1**) sends a message to CLINTON (**CFB8**) as if he had been trying to contact him. CLINTON advises CHRISTIAN that he had been ill and sends CHRISTIAN a picture of a medical excuse. CLINTON ascertains the whereabouts of CHRISTIAN and advises that he has transportation. CHRISTIAN advises he is at his residence and waiting for JACKSON to come back home. CLINTON confirms that he has money for CHRISTIAN. During the text conversation, CHRISTIAN makes voice calls over **FB1** to CLINTON. This communication is not intercepted and investigators are unable to determine the context of those voice calls (those voice calls are identified in the below verbatims). After the voice calls, CLINTON inquires on CHRISTIAN's estimated time of arrival and advises CHRISTIAN to park in the visitors section when he arrives. Investigators conducting surveillance were able to observe JACKSON and CHRISTIAN leave their residence. JACKSON was the driver of **TV2** where CHRISTIAN was the passenger. After JACKSON and CHRISTIAN left the residence, CHRISTIAN no longer responded to CLINTON. Investigators observed the GPS for CHRISTIAN **TP1** to be in the area of his residence. After leaving the residence, **FB2** was utilized to communicate with CLINTON.   The verbatim conversation is below with investigator notes in italics:

CHRISTIAN (**FB1**):      Yo

CLINTON (**CFB8**):      im bout to be hom in like 30 I been throwing up crazy smh

CLINTON (**CFB8**) sends a picture to CHRISTIAN (**FB1**) showing a medical excuse form.

CLINTON (**CFB8**):   where you at im on wheels *(CLINTON ascertains on CHRISTIAN's whereabouts and advises he has transportation)*

CHRISTIAN (**FB1**):   I'm in the crib Waiting on my girl to get back *(CHRISTIAN advises he is at his residence)*

CLINTON (**CFB8**):   ite well I got u an my mans got 60 *(CLINTON advises he has money for CHRISTIAN)*

CLINTON (**CFB8**):   im going out Winchester in alittle wit shawty *(CLINTON advises he isn't going to be around long and will be leaving town)*

CHRISTIAN (**FB1**) makes a phone call over Facebook to CLINTON (**CFB8**)

CHRISTIAN (**FB1**) makes a phone call over Facebook to CLINTON (**CFB8**)

CLINTON (**CFB8**):   how long so I know if I should jus wait in my mans whip *(CLINTON ascertains on the timeframe CHRISTIAN will arrive at his location)*

CLINTON (**CFB8**):   park behind crib in visitors *(CLINTON advises CHRISTIAN where to park when he arrives at CLINTON's residence)*

CHRISTIAN (**FB1**):   Ok

CLINTON (**CFB8**):   Like 20 minutes

CHRISTIAN (**FB1**):   yerrr

| CLINTON (**CFB8**): | park behind crib in visitors please *(CLINTON again advises CHRISTIAN where to park with he arrives)* |
| JACKSON (**FB2**): | ok *(The communication switches over to FB2 and JACKSON and/or CHRISTIAN is utilizing FB2 to communicate with CLINTON) (Investigators conducted surveillance during this transaction)* |
| JACKSON (**FB2**): | here *(JACKSON and/or CHRISTIAN advise CLINTON they have arrived)* |
| CLINTON (**CFB8**): | boutta come using bathroom |
| JACKSON (**FB2**): | k |
| CLINTON (**CFB8**): | I got that 20 everything was straight what I said earlier I was geekin but hold ne down tn I already got some plays too *(Investigators believe CLINTON was supplied 20 grams of drugs and CLINTON confirms that by weighing it. CLINTON further advises he has some of the drugs sold already)* |

54. On March 17, 2020 investigators monitoring communications occurring over **FB1** intercepted messages from CODDINGTON (**CFB9**) contacts CHRISTIAN (**FB1**) and requests to be supplied drugs. CHRISTIAN does not respond to these messages. The verbatim conversation is below with investigator notes in italics:

CODDINGTON (**CFB9**): Hey you any good by chance? *(CODDINGTON is asking CHRISTIAN if he was able to supply CODDINGTON drugs)*

CODDINGTON (**CFB9**): Got $400 now and if you do a zip for $600 I'll go get the other $200 *(CODDINGTON is requesting to purchase an ounce of drugs from CHRISTIAN for $600)*

55. On March 18, 2020, monitors intercepted communication where CLINTON (**CFB8**) arranged to purchase drugs from CHRISTIAN (**FB1**) in exchange for currency. CLINTON was obtaining money from yet to be fully identified individuals to purchase $200 worth of drugs. Investigators conducted physical surveillance near the intersection of Dunrobin Drive and Crenshaw Way in Martinsburg, West Virginia. At approximately 1710 EST, investigators observed **TV2** traveling on Dunrobin Drive toward the intersection of Crenshaw Way. After traveling through the intersection, the vehicle proceeded on and turned right on Litchfield Lane. Investigators observed the vehicle to pull into a parking space in front of the townhouse located at 54 Litchfield Lane E and immediately back out to turn the vehicle around. The vehicle then turned back onto Dunrobin Drive before making an immediate left hand turn into E Calabash Court and backed into a parking space facing the rear side of townhomes located on Litchfield Lane. At approximately 1715 EST, Investigators observed a black male who was positively identified as CLINTON standing at the passenger side door of **TV2** interacting with the front seat passenger of the vehicle. CLINTON then turned around and jogged towards the back side of the townhomes as **TV2** proceeded to drive away. CLINTON was observed jogging around the side of the townhomes and up the stairs of the residence (later confirmed to be 54 Litchfield Lane E).

| | |
|---|---|
| CLINTON (**CFB8**): | wasssup with it got big plays after work i go in at 11 *(CLINTON is advising that he has drug deals arranged after he gets off of work at 11 and is letting CHRISTIAN know he will need CHRISTIAN to supply him drugs)* |
| CHRISTIAN (**FB1**): | Ok |
| CHRISTIAN (**FB1**): | Just hit me *(CHRISTIAN advises CLINTON to contact him when he is ready)* |
| CLINTON (**CFB8**): | ite *(Alright)* |
| CLINTON (**CFB8**): | might be getting off earlier *(CLINTON advises he may be getting off work before 11)* |
| CLINTON (**CFB8**): | yoo |

CLINTON (**CFB8**) makes a voice call to CHRISTIAN (**FB1**)

| | |
|---|---|
| CLINTON (**CFB8**): | im off work early my mans gonna have 200 but can i slide an grab it now so I can make a couple other movex *(CLINTON advises CHRISTIAN that he is off work early and his drug customer will have $200. CLINTON asks if he can come to CHRISTIAN so that he can be supplied drugs. CLINTON advises he needs the drugs because he has drug sales arranged)* |
| CLINTON (**CFB8**): | im at crib now *(CLINTON advises CHRISTIAN that he is home)* |

CHRISTIAN (**FB1**):  Ok just got up  waiting on my girl *(CHRISTIAN acknowledges the previous messages and advises he is waiting on JACKSON so they can deliver the drugs to CLINTON)*

CLINTON (**CFB8**):  ite bet i could prob get the money before ima hit him *(CLINTON advises he can probably get the money from his drug customer before CHRISTIAN supplies CLINTON the drugs. CLINTON advises he is going to contact his drug customer)*

CHRISTIAN (**FB1**) sends a thumbs up image

CLINTON (**CFB8**) sends a screenshot of a text conversation. The contact CLINTON is speaking with is "Lor Cig". The conversation with "Lor Cig" was indicative of drug talk. *(Investigators believe this is the drug customer that CLINTON was referencing in the previous text messages. "Lor Cig" has not been identified or intercepted over **TP1**, **FB1**, or **FB2**. Investigators believe "Lor Cig" is not a known person with CHRISTIAN)*

CHRISTIAN (**FB1**):  Yo u call

CLINTON (**CFB8**):  nah

CLINTON (**CFB8**) sends CHRISTIAN (**FB1**) a screen shot of a text conversation between CLINTON and "Lor Cig". The conversation with "Lor Cig" was indicative of drug talk. *(Investigators believe this is the drug customer that CLINTON was referencing in the previous text messages. "Lor*

*Cig" has not been identified or intercepted over **TP1, FB1,** or **FB2.**
Investigators believe "Lor Cig" is not a known person with CHRISTIAN)*

CHRISTIAN (**FB1**) makes a voice call to CLINTON (**CFB8**)

CLINTON (**CFB8**):  my mans across strest got 100 an my mans that's gonna be otw got 100 but hes trynna get more an I got couple little moves so yea but my mom otw back home *(CLINTON advises CHRISTIAN that he has multiple drug customers waiting for CHRISTIAN to supply CLINTON with drugs. CLINTON advises two separate drug customers have $100 each. CLINTON further advises he has more drug sales arranged)*

56.  On March 18, 2020, investigators monitoring communications occurring over **FB1** intercepted messages from DIRTING (**CFB5**) contacts CHRISTIAN (**FB1**). The message identifies the user at this time as CODDINGTON. CODDINGTON identifies herself and asks if CHRISTIAN is available to distribute narcotics to her. The verbatim conversation is below with investigator notes in italics:

DIRTING (**CFB5**):  Hey it's Jaime you good and around? *(Investigators believe CODDINGTON is utilizing DIRTING's Facebook account to communicate with CHRISTIAN. CODDINGTON is requesting to be supplied narcotics by CHRISTIAN)*

DIRTING (**CFB5**):   What's up little dog (*Investigators believe the term "little dog" is a common reference utilized by DIRTING when communicating with CHRISTIAN*)

57. On March 18, 2020, investigators monitoring communications occurring over **FB1** intercepted messages from CHRISTIAN (**FB1**) and CODDINGTON (**CFB9**) where CHRISTIAN initiates the communication. CODDINGTON responds and asks if CHRISTIAN is around and available to supply CODDINGTON with narcotics. CODDINGTON advises her location and the amount of money she has on her person. CODDINGTON again inquires if CHRISTIAN would sell an ounce of drugs to her for $600. Investigators conducting surveillance were able to locate CODDINGTON at a location she provided to CHRISTIAN. Surveillance was able to maintain visual contact with CODDINGTON and later observed JACKSON and CHRISTIAN arrive utilizing **TV2**. Investigators lost visual with CODDINGTON and **TV2** for a brief moment. Investigators conducting surveillance were able to locate **TV2** and then observed CODDINGTON to be a passenger in **TV2**. After observing CODDINGTON inside **TV2**, investigators located the vehicle, CODDINGTON was operating, at a prior residence associated with her and DIRTING. Investigators were able to conduct surveillance on **TV2** and observe it travel in to Maryland where investigators believe CHRISTIAN met with a drug supplier. It is believed, after CHRISTIAN left his residence, CHRISTIAN no longer responded to CODDINGTON. Investigators observed the GPS for CHRISTIAN **TP1** to be in the area of his residence. After leaving the residence, **FB2** was utilized to communicate with CODDINGTON. JACKSON makes voice calls over **FB2** to CODDINGTON. This communication is not intercepted and investigators are unable to determine the context of those voice calls (those voice calls are identified in the below verbatims). Although investigators are unable to determine the content of these calls, investigators believe they are used to further arrange the distribution of drugs. Before and after the voice calls, the

intercepted conversation reveals drug talk. The timing of these calls further leads investigators to believe that the voice calls are not used to speak about a separate subject but only used to further the distribution of narcotics. The verbatim conversation, with the order of the voice calls, with CODDINGTON arranging the drug transaction with CHRISTIAN and JACKSON is below with investigator notes in italics:

| | |
|---|---|
| CHRISTIAN (**TP1**): | Yo |
| CODDINGTON (**CFB9**): | Hey you around |
| CHRISTIAN (**TP1**): | Yo |
| CODDINGTON (**CFB9**): | You around |
| CODDINGTON (**CFB9**): | You good *(CODDINGTON is inquiring if CHRISTIAN can distribute drugs to her)* |
| CODDINGTON (**CFB9**): | I'm at health dept can you see me quick *(Investigators believe CODDINGTON is advising she is at the health department in Berkeley County, West Virginia)* |
| CHRISTIAN (**FB1**): | Y way up |
| CHRISTIAN (**FB1**) makes a phone call over Facebook to CODDINGTON (**CFB9**) | |
| CODDINGTON (**CFB9**): | I'm at health dept off king st |
| CODDINGTON (**CFB9**): | Got $400 on me |
| CODDINGTON (**CFB9**): | What you do for 600?? whole zip? I'm down at health dept now I gotta go out behind sheetz to work force nana meet me there *(CODDINGTON is inquiring if CHRISTIAN would distribute an ounce (28 grams) of drugs to CODDINGTON for $600)* |
| CODDINGTON (**CFB9**): | Let me know I'm at Burger King *(CODDINGTON gives her whereabouts. At this time, investigators conducting surveillance locate CODDINGTON* |

|  |  |
|---|---|
|  | *operating a Dodge truck that is known to be operated by DIRTING)* |
| CODDINGTON (**CFB9**): | I got $600 |
| CODDINGTON (**CFB9**): | Hey I'm going to schewells cuz pops is afraid I won't get there to pay his 3 payments behind so lemme know what you wanna do *(CODDINGTON gives her whereabouts)* |
| JACKSON (**FB2**) makes a phone call over Facebook to CODDINGTON (CFB9) |
| JACKSON (**FB2**): | here *(Investigators believe there was conversation over the voice call with FB2 and CODDINGTON where JACKSON and/or CHRISTIAN was advised where to travel to meet with CODDINGTON)* |
| CODDINGTON (**CFB9**): | Be out in a min |

58.  On March 18, 2020, investigators monitoring communications occurring over **FB1** observed PENDLETON (**CFB3**) attempt to contact CHRISTIAN via a voice call over FB1. The call was not answered. Wire monitors intercepted communication with PENDLETON contacting JACKSON over **FB2** where he asked JACKSON to have CHRISTIAN contact him. During the conversation, PENDLETON was requesting to be supplied narcotics by CHRISTIAN. After the initial message from PENDLETON, JACKSON utilizes **FB2** and makes a voice call to PENDLETON. This communication is not intercepted and investigators are unable to determine the context of this voice calls (the voice calls are identified in the below verbatims). Although investigators are unable to determine the content of these calls, investigators believe they are used to further arrange the distribution of drugs. Before and after the voice calls, the intercepted conversation reveals drug talk. The timing of these calls further leads investigators to believe that the voice calls are not used to speak about a separate subject but only used to further the distribution of narcotics. The verbatim conversation with PENDLETON arranging the drug transaction with

41

CHRISTIAN and JACKSON, along with the order of the voice calls, is below with investigator notes in italics:

PENDLETON (**CFB3**) makes a voice call over Facebook to CHRISTIAN (**FB1**)

PENDLETON (**CFB3**):   Hey can big man hit megot like 3 *(Investigators believe PENDLETON is advising JACKSON that he has $300 and is requesting CHRISTIAN to supply him with narcotics)*

JACKSON (**FB2**) makes a voice call over Facebook to PENDLETON (**CFB3**)

PENDLETON (**CFB3**):   Cam I get 2 and pay u a buck bro *(Investigators believe PENDLETON is sending a message over TP2 that is intended for CHRTISTIAN. PENDLETON is asking to be supplied two (2) 8-balls of drugs and PENDLETON only pay for one (1) 8-ball)*

PENDLETON (**CFB3**):   Herebro *(Investigators believe PENDLETON and JACKSON agreed on a meeting location in the above captioned voice call)*

PENDLETON (**CFB3**):   Yo bro way *(PENDLETON has arrived at the meeting location and is attempting to locate CHRISTIAN)*

JACKSON (**FB2**):   here

PENDLETON (**CFB3**):   Walking in bathroom *(Investigators conducting surveillance on JACKSON and CHRISTIAN were able to observe TV1 travel to a gas station in Berkeley County, West Virginia. Investigators believe this is the location where PENDLETON and CHRISTIAN agreed to meet. Investigators spoke with an employee at the gas station and*

42

*requested the video surveillance. That video surveillance is pending at this time)*

59.  On March 18, 2020, investigators monitoring communications occurring over **FB2** observed JACKSON (FB2) engage in a text conversation with FRYE (**CFB10**), at 0252 hours, where JACKSON was requesting to be supplied prescription pain medication by FRYE. FRYE advised she did not have any more prescription pain medication but would go with JACKSON at around 0800 hours to obtain more. Wire monitors interception further conversation at 0856 hours where FRYE contacts JACKSON and asks if she still wanted the medication. At 0926 hours, FRYE advises she was able to obtain the prescription pain medication. JACKSON inquires where they two would need to travel to obtain the medication. FRYE did not respond over Facebook. Wire monitors observed an active PEN register for **TP2** and observed FRYE to be utilizing 304-702-6791. Wire monitors observe FRYE to utilize **CP3** and send a text message to JACKSON (**TP2**) at 0857 hours. At 0928 hours, FRYE utilizing **CP3** called JACKSON (**TP2**). The call lasted for 55 seconds. At 0950 hours, FRYE utilizing CP3 called JACKSON (**TP2**). The call lasted for 25 seconds. Although this communication was observed over the Pen register for **TP2**, investigators are not able to determine to content of calls/texts. Because of the timing of the calls and/or texts between **TP2** and **CP3**, investigators believe that **TP2** was utilized to further the distribution of narcotics. After **CP3** communicated with **TP2**, the conversation between **FB2** and **CFB10** stopped. This further leads investigators to believe the prior conversation between **FB2** and **CFB10** was then continued over **TP2**. Investigators conducting surveillance were able to locate JACKSON operating **TV2** in Berkeley County, West Virginia. Investigators observed JACKSON arrive and park in front of a closed business. FRYE is known to reside in an apartment above this business. Investigators observed a black female, later identified as FRYE via publicly obtained photographs, exit the building and enter the front passenger seat of

43

**TV2**. JACKSON and this female leave the area and drive to a residence in Berkeley County, West Virginia. The verbatim conversation with JACKSON arranging the transaction of prescription pain medication with FRYE is below with investigator notes in italics:

| | |
|---|---|
| JACKSON (**FB2**): | u awake? (@ 0252 hours) |
| FRYE (**CFB10**): | Yeah  (@ 0252 hours) |
| JACKSON (**FB2**): | would u happen to have a couple u wanna get rid of im sure the ppls aint awake (@ 0254 hours) *(JACKSON inquires if FRYE has any prescription pain medication that she would be willing to sell to JACKSON. JACKSON believes FRYE's prescription pain medication supplier would not be awake at this time)* |
| FRYE (**CFB10**): | No I leterally just did my last 2 before I was about to go to bed but we can go early in the morning if u want (@ 0257 hours) *(FRYE advises she consumed the last of her prescription pain medication but advises she and JACKSON can get to the supplier in the morning)* |
| JACKSON (**FB2**): | ok (@ 0258 hours) |
| JACKSON (**FB2**): | ill hit u when I get up if I even go to sleep how early can u go (@ 0258 hours) *(JACKSON advises she will contact FRYE in the morning)* |
| FRYE (**CFB10**): | Probably like 8 (@ 0301 hours) *(FRYE tells JACKSON she would be available at 0800 hours)* |
| JACKSON (**FB2**): | ok (@ 0301 hours) |

FRYE (**CFB10**):     Let me know if u want them still *(@ 0856 hours FRYE contacts JACKSON and asks if she still wants to purchase the medication)*

JACKSON (**FB2**):     hey (@ 0926 hours)

FRYE (**CFB10**):     Hey (@ 0926 hours)

FRYE (**CFB10**):     I can get them (@ 0928 hours) *(FRYE advises she can obtain the medication JACKSON is requesting)*

JACKSON (**FB2**):     those still good (@ 0929 hours)

JACKSON (**FB2**):     n where u gotta go (@ 0930 hours) *(JACKSON inquires on where she would need to transport FRYE to obtain the medication. After this message, Investigators observed FRYE and JACKSON to be communicating over **TP2** through the pen trap and trace order of **TP2**. Although investigators observed this communication occur, they are unable to view the content of the calls/texts over a Pen trap and trace. No further conversation pertaining to this drug transaction took place over **FB2**)*

60.     On March 24, 2020, investigators monitoring communications over **FB1** observed CHRISTIAN (**FB1**) engage in a text conversation with UNSUB 6345 (**CFB11**) where UNSUB 6345 identified herself as "Sam's daughter". Investigators believe UNSUB 6345 is advising she is ENGLE's daughter. The conversation between the two speak of a recent hospitalization of ENGLE. During the conversation, UNSUB 6345 provides a telephone number for ENGLE. After providing the telephone number to CHRISTIAN, UNSUB 6345 (**CFB11**) makes a voice call to CHRISTIAN (**FB1**). Investigators believe ENGLE is utilizing CFB11 to communicate with CHRISTIAN over **FB1**. In the below communication, ENGLE attempts to purchase narcotics from CHRISTIAN. The

45

verbatim conversation, with the order of the voice call, is below with investigator notes in italics:

| | |
|---|---|
| UNSUB  6345 (**CFB11**): | Hey this is Lindsay sams daughter she deleted her Facebook *(Investigators believe* UNSUB  6345 *is advising she is ENGLE's daughter)* |
| CHRISTIAN (**FB1**): | O ok how is she doin *(CHRISTIAN inquires about ENGLE and a recent hospitalization)* |
| UNSUB  6345 (**CFB11**): | She's okay but she said she's upset you didn't come see her & she said could you help her get them things you take because she's in lots of pain & the hospital only gave her a couple *(*UNSUB  6345 *is advising ENGLE is wanting CHRISTIAN to supply her with pain medication)* |
| UNSUB  6345 (**CFB11**): | Mom said call 304 3509273 *(*UNSUB  6345 *provides CHRISTIAN with ENGLE's new telephone number (***CP4***). On March 27, 2020, at 10:11 a.m., investigators observed, via pen trap and trace, ***TP2*** make an outgoing call to ***CP4***. Investigators believe CHRISTIAN utilized ***TP2*** to make this call. This call lasted for 1 minute and 40 seconds. Although investigators observed this communication, they are unable to view the content of the calls/texts over a Pen trap and trace)* |

UNSUB  6345 (**CFB11**) makes a voice call to CHRISTIAN (**FB1**) *(This call is not connected)*

| | |
|---|---|
| UNSUB  6345 (**CFB11**): | I got 80 my friend wants some can bring me a g ur gonna make out she gonna give me some pain pills *(Investigators believe ENGLE begins to use* UNSUB  6345*'s Facebook account to communicate with* |

|  | *CHRISTIAN. ENGLE is trying to arrange a drug transaction with CHRISTIAN)* |
|---|---|
| UNSUB  6345 (**CFB11**): | You know what I thought u was my friend and I wait for in the hospital I was upset I've help u and u helped me but when I needed u was not there u hurt me my feelings are hurt I guess I won't talk to u anymore take care this is Sam *(ENGLE is frustrated with CHRISTIAN and that he didn't respond to her previous message. ENGLE leaves what investigators believe is her signature "Sam" at the end of the text)* |
| CHRISTIAN (**FB1**): | Hey sam (CHRISTIAN confirms that he is talking with ENGLE over **CFB11**) |
| CHRISTIAN (**FB1**): | U is my friend I didn't even know what hospital you were in and I been out of town for a min you got to know if I did get in Touch with u u should have known something is not rite come on now *(CHRISTIAN tries to mend his friendship with ENGLE)* |
| UNSUB  6345 (**CFB11**): | I need ur help with one of them I'm moving to htown on the 1st I have no loyal friends here I need u to look out for me I'm done doing it need to make some money I have lots of sells now but I know u won't help me get back on my feet I'll never see you *(ENGLE advises that she needs CHRISTIAN to supply her with drugs so that she can redistribute them to make money)* |
| CHRISTIAN (**FB1**): | When I get back in town I'll see what I can do *(CHRISTIAN advises he is not in town at the* |

> moment and will see about providing drugs to ENGLE when he gets back)

UNSUB 6345 (**CFB11**):   I probably not out of town I got 80 now *(ENGLE advises she has $80 right now for drugs)*

CHRISTIAN (**FB1**):   Sam love you *(CHRISTIAN confirms he is talking with ENGLE)*

CHRISTIAN (**FB1**):   I miss you

61.   On April 3, 2020, investigators monitoring communications over **FB2** observed CLINTON (**CFB8**) engage in a text conversation with JACKSON (**FB2**) where CLINTON advises he has $50 and asks if CHRISTIAN wants the money. JACKSON advises that she would meet with CLINTON to obtain the money from him. CLINTON advises JACKSON he was trying to obtain drugs for the $50. The verbatim conversation is below with investigator notes in italics:

CLINTON (**CFB8**):   i got 50 if pops want it *(Investigators believe CLINTON is referring to CHRISTIAN when he says "pops". CLINTON is attempting to obtain $50 of drugs from CHRISTIAN but is going through JACKSON)*

JACKSON (**FB2**):   He sleep but ill pick it up when i get up *(JACKSON is advising CHRISTIAN is currently asleep but she will meet CLINTON to obtain the money)*

CLINTON (**CFB8**):   i mean i needed *(Investigators believe CLINTON is advising JACKSON that the $50 has is for drugs and he is trying to obtain drugs from JACKSON/CHRISTIAN)*

62.   On April 5, 2020, investigators monitoring communications over **FB1** observed CLINTON (**CFB8**) engage in a text conversation with CHRISTIAN (**FB1**) where CLINTON contacts CHRISTIAN and asks to be supplied with $170 worth of

drugs. CHRISTIAN inquires of CLINTON's location. CLINTON gives his location and asks CHRISTIAN to give him more drugs. Investigators believe CHRISTIAN advises that he cannot give CLINTON drugs with out payment. CLINTON then asks to be supplied 7 grams for $170. During the conversation, CHRISTIAN and CLINTON call each other over **FB1**. Although investigators are unable to determine the content of these calls, investigators believe they are used to further arrange the distribution of drugs. Before and after the voice calls, the intercepted conversation between CHRISTIAN and CLINTON references drug talk. The timing of these calls further leads investigators to believe that the voice calls are not used to speak about a separate subject but only used to further the distribution of narcotics. The verbatim conversation, with the order of the voice calls, is below with investigator notes in italics:

CLINTON (**CFB8**):        anything *(CLINTON is asking CHRISTIAN if he has any drugs to sell)*

CHRISTIAN (**FB1**):        Wuz up

CLINTON (**CFB8**):        u gucci i got 170 *(CLINTON advises he has $170 to spend on drugs)*

CHRISTIAN (**FB1**):        Where u at

CLINTON (**CFB8**):        sheetz by burgee king *(Investigators believe CLINTON is advising he is at a Sheetz gas station located off of King St. in Berkeley County, WV)*

CLINTON (**CFB8**):        burger

CLINTON (**CFB8**):        I gotta stop fuckin wit these feins fam they be on some schemin shit . *(Investigators believe CLINTON is at the Sheetz gas station waiting on a drug customer and is complaining about the customer)*

CLINTON (**CFB8**):        u should throw me something on top of that an I got u 100 *(CLINTON is requesting CHRISTIAN to supply him more drugs than what he is paying for)*

CHRISTIAN (**FB1**):   I wish I could but not at this min *(CHRISTIAN advises he can not give CLINTON drugs with out payment right now)*

CLINTON (**CFB8**):   damn well can u do me 7 for 170 so I can come up this 30 I got 2 but im trynna eat off my mans *(Since CHRISITAN will not give CLINTON drugs, CLINTON asks if he can purchase 7 grams of drugs for $170. Investigators believe CLINTON is obtaining $200 from a drug customer and he is going to keep $30 for himself)*

CHRISTIAN (**FB1**) makes a voice call to CLINTON (**CFB8**)

CLINTON (**CFB8**):   what u want me to do *(CLINTON is waiting for CHRISTIAN and asks what CHRISTIAN needs him to do)*

CHRISTIAN (**FB1**):   Come to the 7-Eleven *(Investigators believe CHRISTIAN is advising CLINTON to come to the 7-Eleven convenience store located close to CHRISTIAN's residence)*

CLINTON (**CFB8**) sends a thumbs up image to CHRISTIAN (**FB1**)

CLINTON (**CFB8**):   ite coming which one not the hot one lol *(CLINTON advises he is on his way and asks which 7-Eleven he needs to go to)*

CLINTON (**CFB8**) makes a voice call to CHRISTIAN (**FB1**)

CLINTON (**CFB8**) makes a voice call to CHRISTIAN (**FB1**)

CLINTON (**CFB8**):   im lit *(Investigators believe CLINTON is advising that he is intoxicated)*

CHRISTIAN (**FB1**):   Where u at

CLINTON (**CFB8**):   pasding bowling alley fam *(Investigators believe CLINTON is advising he is traveling south on Rt. 11*

| | |
|---|---|
| | *in Berkeley County, WV and he is passing the bowling alley)* |
| CHRISTIAN (**FB1**): | Ok |
| CLINTON (**CFB8**): | boutta pull up im in bercundi mini suv *(CLINTON advises he will be in a burgundy suv)* |
| CLINTON (**CFB8**): | im here at gas pump *(CLINTON advises that he is at the 7-Eleven and parked at the gas pump)* |
| CLINTON (**CFB8**): | jaunt short fam *(Investigators believe after CLINTON obtained drugs from CHRISTIAN, he placed them on a scale and the drugs did not weigh 7 grams. CLINTON express this to CHRISTIAN and advises the weight of the drugs was "short" or under 7 grams)* |

CHRISTIAN (**FB1**) makes a voice call CLINTON (**CFB8**)

63.  On April 5, 2020, investigators monitoring communications over **FB2** observed DIRTING (**CFB5**) engage in a text conversation with JACKSON (**FB2**). During the conversation, investigators believe DIRTING is inquiring whether or not CHRISTIAN has arrived back home from obtaining a re-supply of drugs. JACKSON advises DIRTING that CHRISTIAN will be home tonight. The verbatim conversation is below with investigator notes in italics:

| | |
|---|---|
| DIRTING (**CFB5**): | Hey did little dog make it back yet dear *(Investigators believe DIRTING had been aware CHRISTIAN left town and is inquiring whether or not CHRISTIAN has arrived home. Investigators believe this would be a re-supply of drugs for CHRISTIAN and DIRTING is trying to obtain drugs from CHRISTIAN)* |
| JACKSON (**FB2**): | Tonight *(JACKSON confirms that CHRISTIAN will be home tonight)* |

51

DIRTING (**CFB5**):          Ok

## ANALYSIS OF TELEPHONE RECORDS FOR 540-327-0261 (TP2)

64.  An analysis of phone records and/or court-authorized pen register and trap and trace data from 02/25/2020 through 04/06/2020, revealed that the **TP2** was used to make or receive a total of 1,828 text messages with the following text messages communications:

- 402 text messages to or from the cellular phone number 304-702-6791 (**CP3**) used by FRYE, with the most recent text occurring on 03/25/2020.
- 67 text messages to or from the cellular phone number 304-350-9273 (**CP4**) used by ENGLE, with the most recent text occurring on 04/04/2020.

65.  An analysis of phone records and/or court-authorized pen register and trap and trace data from 02/25/2020 through 04/06/2020, revealed that the **TP2** was used to make or receive a total of 1,734 calls with the following calls:

- 77 calls to or from the cellular phone number 304-702-6791 (**CP3**) used by FRYE, with the most recent call occurring on 03/28/2020.
- 53 calls to or from the cellular phone number 304-350-9273 (**CP4**) used by ENGLE, with the most recent call occurring on 04/04/2020.

## ANALYSIS OF FACEBOOK ACCOUNT RECORDS FOR FACEBOOK ID# 100000756809234 (FB1)

66.  An analysis of Facebook Account records and/or court-authorized interception (3:20MC22) data from 03/11/2020 through 04/06/2020, revealed that the **FB1** was used to make or receive a total of 5,919 messages with the following messages:

- 253 text messages to or from the Facebook ID 100000176581422 (**CFB8**) used by CLINTON, with the most recent text occurring on 04/05/2020.

67.   An analysis of Facebook Account records and/or court authorized interception (3:20MC22) date from 3/11/2020 through 4/6/2020, revealed that **FB1** was used to make or receive a total of 674 wire communications with the following wire communication:

- 46 wire communications to or from the Facebook Account # 100000176581422 (**CFB8**) used by CLINTON, with the most recent wire communication occurring on 04/05/2020.

## ANALYSIS OF FACEBOOK ACCOUNT RECORDS FOR FACEBOOK ID# 100003308781682 (FB2)

68.   An analysis of Facebook Account records and/or court-interception (3:20MC22) data from 03/11/2020 through 04/06/2020, revealed that **FB2** was used to make or receive a total of 6,902 messages with the following messages:

- 365 messages to or from the Facebook Account ID# 100000176581422 (**CFB8**) used by CLINTON, with the most recent message occurring on 04/05/2020

69.   An analysis of Facebook Account records and/or court authorized interception (3:20MC22) date from 3/11/2020 through 4/6/2020, revealed that **FB2** was used to make or receive a total of 416 wire communications with the following wire communication:

- 31 wire communications to or from the Facebook Account # 100000176581422 (**CFB8**) used by CLINTON with the most recent wire communication occurring on 04/04/2020.

## NEED FOR INTERCEPTION

53

70.   The objective of this investigation is to obtain evidence to fully prosecute MICHAEL CHRISTIAN, MISTY JACKSON, other TARGET SUBJECTS, and others as yet unknown involved in the drug trafficking enterprise.

71.   I believe that the interception of wire and electronic communications over **TP2,** electronic communications over **FB1** and **FB2** will enable the government to further the goals and objectives of this investigation. Specifically, these include:

      a.    discovering the full scope and identification of key personnel involved in illegal drug trafficking on behalf of CHRISTIAN, JACKSON and the DTO;

      b.    discovering the identities and roles of all "molly", and/or other drugs or controlled substances to CHRISTIAN, JACKSON and the identified conspirators;

      c.    discovering the identity of the main customers of CHRISTIAN, JACKSON and the others yet unknown;

      d.    discovering the stash locations where "molly" and/or other drugs are stored prior to distribution;

      e.    discovering the management and disposition of proceeds generated by the organization's narcotics trafficking; and

      f.    obtaining admissible evidence that demonstrates beyond a reasonable doubt that CHRISTIAN, JACKSON and the other TARGET SUBJECTS and any later identified targets, committed the alleged violations of law set forth herein.

72.   Interception of wire and electronic communications over **TP2**, electronic communications over **FB1** and **FB2** is necessary in this matter because normal investigative techniques have been tried and have failed to fully achieve the goals and objectives of this investigation, appear reasonably unlikely to succeed if tried, or are too dangerous to be tried.

73.    Considerable effort has been expended during this investigation and many of the normal investigative procedures have been utilized, which brings me to a conclusion that a widespread, ongoing Molly/MDMA distribution operation is being carried out by identified CHRISTIAN and JACKSON, co-conspirators, and others yet unknown.  Despite all of the investigative tools used thus far, the investigation to date has not met all of its goals in dismantling the entire criminal enterprise.  All of the drug activities of the target subjects, their associates and co-conspirators to include obtaining drugs, transportation of the drugs, the distribution of the drugs, the collection of funds generated by the sales of the drugs, and the remitting of collected funds to distributors and suppliers require the ability to communicate securely and to move drugs in a manner not easily detected by law enforcement.

74.    The following is a list of the investigative techniques that have been used or considered thus far in this investigation. Details about the use of each technique with regard to CHRISTIAN, JACKSON and the other TARGET SUBJECTS, the success or failure of the technique, and what the technique has accomplished or failed to accomplish with regard to the goals and objectives of this investigation are discussed.   If an investigative technique was not employed, investigators have provided an explanation as to why the technique was not used.

75.    Investigators believe the best opportunity to meet the goals of this investigation is obtaining the authority to intercept electronic and wire communications over **TP2** and electronic communications over **FB1** an **FB2**. At this point, we have not fully identified CHRISTIAN's source of supply, or the true reason of why they travel to Washington D.C. or Winchester, Virginia. The identification of JACKSON utilizing **TP2** to communicate, as referenced above with TARGET

SUBJECTS, is thwarting the goals of this investigation. Especially, since CHRISTIAN has failed to utilize **TP1**, as it was observed by the pen trap and trace orders for **TP1** prior to the authorization of interceptions over **TP1**.

### Confidential Sources

76.  It is my experience that confidential sources normally have limited information, either furnished by a subject or learned secondhand from others. I believe that this information would not, without the evidence sought by this application, result in a successful prosecution of all members of this illegal DTO.

77.  In the present case, investigators have been able to develop and utilize confidential informants to make controlled drug purchases from REDMAN, ENGLE, and CHRISTIAN. Although a confidential informant is able to discuss immediate drug transactions between themselves and a TARGET SUBJECT, the informant used in this investigation (CI-BLUE) has not been able to discuss sources of drug supply for the DTO or drug transactions that involved other non-present customers. During the captioned law enforcement-controlled purchase from CHRISTIAN, CHRISTIAN advised that he would not allow anyone to meet his drug supplier. Therefore, CHRISTIAN drove to what is believed to be a stash location in Winchester, Virginia and then returned to provide purported "molly" to CI-BLUE. The confidential informant listed has been able to provide investigators with drug amounts and drug prices that are relevant to the controlled purchases made on behalf of the EPD&VCTF. However, they have not been able to provide investigators with drug amounts and prices relevant to the DTO's source of drug supply. Furthermore, the confidential informant has not been able to provide any investigative intelligence that would assist officers in furthering this investigation beyond CHRISTIAN's hierarchy level within the DTO. CI-BLUE is currently not in a position to continue to make any controlled purchases of drugs from members

of this DTO, to include CHRISTIAN. EPD&VCTF investigators are seeking to obtain identities of the source of drug supply to CHRISTIAN's DTO, stash house locations utilized by the DTO, any and all methods used by the DTO to conceal drug proceeds, and methods used to traffic the narcotics into the Eastern Panhandle region of West Virginia. The confidential informant has been unable to provide this information. The confidential informant used in this investigation have been advised of the potential for a need to testify in this case. Due to the nature and conduct related to violence of the drug community, confidential informant may be reluctant to testify. As such, the need to intercept communications occurring over **TP2, FB1** and **FB2** exists to allow the EPD&VCTF to continue this investigation should the confidential informant later refuse to testify.

### Controlled Purchases

78.   During the course of this investigation, I, along with other agents and other law enforcement officers, participated in over six controlled purchases of narcotics, using confidential informants, from CHRISTIAN, ENGLE and REDMAN and other members and associates of the DTO. These controlled purchases have not been effective in meeting the goals of this investigation. Surveillance conducted by the EPD&VCTF during the controlled purchases have not revealed where the TARGET SUBJECTS are storing drugs, weapons, and drug proceeds. Although confidential informants have been able to enter residences belonging to TARGET SUBJECTS during controlled drug buys, the target subjects do not reveal drug, weapon, and drug proceeds or stash locations to the confidential informants. Additionally, controlled purchases have allowed investigators to monitor conversations between the confidential informants and the identified TARGET SUBJECTS. These conversations do not reveal the TARGET SUBJECT's sources of drug supply, hierarchy of DTO leadership, or identities of other co-conspirators. The controlled conversations, monitored by law

enforcement officers during controlled purchases, reveal that the TARGET SUBJECTS limit their conversations with the confidential informants to minimal content only necessary to complete the drug transaction at hand. The method of interviewing individuals known to the DTO has been utilized and has failed as those individuals did not reveal any information regarding the DTO's stash houses, methods for concealing drug proceeds, hierarchy structure within the DTO, or ultimate source of drug supply to the DTO. Surveillance conducted by EPD&VCTF members subsequent to controlled drug purchases have failed to reveal the identified TARET SUBJECTS traveling to stash house locations or meeting with potential sources of supply.

**Physical Surveillance**

79.  Surveillance, in and of itself, even if highly successful, rarely succeeds in gathering evidence of the criminal activities under investigation. It is an investigative technique that is used to confirm meetings and other suspected, criminal activity between alleged participants but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and other activity.

80.  When physical surveillance is used in conjunction with court-authorized interception of wire and electronic communications, the purpose of meetings takes on a new significance and may constitute admissible, persuasive evidence of criminal activity.

81.  The subjects of this investigation are extremely cautious and aware of law enforcement surveillance. Attempts to conduct physical surveillance to accomplish the goals of this investigation include but are not limited to the following:

82. On Wednesday, March 18, 2020 at approximately 1445 hours, the EPD&VCTF surveillance units were notified by wire monitors of a drug transaction being arranged between Jaime CODDINGTON and CHRISTIAN. Wire room monitors indicated the deal was for six hundred (600) dollars-worth of "boot." Surveillance units traveled to the location provided by CODDINGTO to CHRISTIAN and observed a blue Dodge Dakota extended cab truck exiting the Burger King parking lot. Wire room monitors advised CODDINGTON was utilizing a Facebook account associated to Shane DIRTING. Monitors further advised DIRTING was known to operate a blue Dodge Dakota, which was later determined to be displaying West Virginia registration 4GT545 which is registered to DIRTING. Monitors then advised CODDINGTON informed CHRISTIAN she was heading to Work Force West Virginia. Investigators observed the Dodge Dakota parked in front of Work Force West Virginia. Investigators observed CODDINGTON walk away from the Dakota and walk inside a Sheetz where she utilized an ATM machine situated inside of the Sheetz Convenience Store. Investigators observed CODDINGTON to have a cellular telephone in her hand and a drink. CODDINGTON exited the store and returned to the Dakota. A short time later, the Dakota was observed leaving the area and traveling to Schewels Furniture Store. Monitors confirmed the transaction between CODDINGTON and CHRISTIAN was going to occur at Schewels. Investigators then observed CHRISTIAN and JACKSON arrive in **TV2**. Investigators then observed **TV2** and Dakota leave the area. CODDINGTON was observed to now be the rear passenger of **TV2**. CHRISTIAN, JACKSON, and CODDINGTON traveled to Maryland before returning to Martinsburg, West Virginia.

83. **TV2** then traveled to Sonny's One Stop located on North Queen Street at the intersection with Grazier Street. **TV2** pulled into the gas pumps and CHRISTIAN exited the vehicle and pumped gas into the vehicle. JACKSON

exited the vehicle and walked back to a silver Saab bearing West Virginia registration NYV168 and appeared to be conduct a hand to hand transaction.

84.   Task Force officers observed CODDINGTON exit **TV2** at Sonny's One Stop and then walk to the address where DIRTING was residing located at 1209 Grazier Street.

85.   On March 18, 2020, monitors intercepted communication where CLINTON arranged to purchase drugs from CHRISTIAN in exchange for currency. CLINTON was obtaining money from yet to be fully identified individuals to purchase $200 worth of drugs. Investigators conducted physical surveillance near the intersection of Dunrobin Drive and Crenshaw Way in Martinsburg, West Virginia. At approximately 1710 EST, investigators observed **TV2** traveling on Dunrobin Drive toward the intersection of Crenshaw Way. After traveling through the intersection, the vehicle proceeded on and turned right on Litchfield Lane. Investigators observed the vehicle to pull into a parking space in front of the townhouse located at 54 Litchfield Lane E and immediately back out to turn the vehicle around. The vehicle then turned back onto Dunrobin Drive before making an immediate left hand turn into E Calabash Court and backed into a parking space facing the rear side of townhomes located on Litchfield Lane. At approximately 1715 EST, Investigators observed a black male who was positively identified as Justin CLINTON (herein referred to as CLINTON), standing at the passenger side door of **TV2** interacting with the front seat passenger of the vehicle. CLINTON then turned around and jogged towards the back side of the townhomes as **TV2** proceeded to drive away. CLINTON was observed jogging around the side of the townhomes and up the stairs of the residence (later confirmed to be 54 Litchfield Lane E).

86.   EPD&VCTF investigators have learned based on the geographic location of CHRISTIAN's residence, and counter-surveillance efforts by CHRISTIAN as

noted in previous surveillance efforts, that continued surveillance will alert CHRISTIAN to law enforcement interest in his activity and the activity of his DTO. Furthermore, based on the knowledge and experience of your affiant, it is understood that drug trafficking organizations often conduct their illegal activities in which extended physical surveillance by law enforcement officers has a higher risk of exposing the presence of the investigation to target subjects. It also poses a risk to officer safety because this DTO has demonstrated a propensity for violence and is known to be in possession of firearms.

87. Efforts to conduct physical surveillance of CHRISTIAN have been minimally successful due to not knowing the whereabouts of CHRISTIAN and JACKSON when they are not at their residence, 1037 Aztec Way, Martinsburg, West Virginia. A location for a fixed video surveillance has not been identified at this time.

88. The approval to intercept **FB1**, **FB2** and **TP1** has been beneficial in identifying the true reason of CHRISTIAN and JACKSON meeting with people who contact them. Although the electronic messages have been useful, the EPD&VCTF are forced to conduct physical surveillance of these drug transactions causing the increased risk of being observed by the targets. The EPD&VCTF only receive interceptions for Facebook on a set interval of time and it is not real time conversations, causing the surveillance to be minutes behind the real time conversations. This is causing the surveillance units to maintain a constant visual on the buyer and/or CHRISTIAN and JACKSON. It is believed this constant surveillance will eventually lead to this investigation being compromised.

89. This constant visual on CHRISTIAN and JACKSON forced the EPD&VCTF to seek a GPS tracker warrant for **TV2**, utilized by CHRISTIAN and JACKSON.

The EPD&VCTF attempted to install the tracker on March 26, 2020, at approximately 0225 hours, but were unable due to the investigators observing CHRISTIAN sitting near an open window where he had a visual of **TV2**. **FB2** interceptions also revealed JACKSON is also communicating with the car dealership where she purchased **TV2** and is requesting to trade it in due to it having multiple issues. Investigators are still attempting to identify a suitable location to install the tracker on **TV2** or obtain a tracker if a new vehicle is purchased by JACKSON and/or CHRISTIAN.

90.   Investigators have utilized a visitor parking space and a neighbor's driveway to conduct fixed surveillance. So far, the Berkeley County Sheriff's Office has received 5 calls in reference to our vehicles. Also, communication over **FB1** between CHRISTIAN and yet to be fully identified female has revealed CHRISTIAN and JACKSON have observed our vehicles. The unknown female also has observed our vehicles, and they appear to be cognizant of our presence. This awareness, has caused us to alter our physical surveillance. Investigators believe with the continued interception of electronic communications over **FB1** and **FB2** and interceptions over **TP2** will assist in identifying meeting locations prior to completing the transactions allowing investigators the time needed to observe the transaction.

91.   Investigators in the case intend to continue conducting physical surveillance in order to positively identify additional associates of the DTO, as well as sources of supply. Investigators believe that continued surveillance done in conjunction with electronic surveillance will achieve these objectives and lead to the seizure of drugs and assets. When surveillance can be planned and conducted with prior knowledge of the TARGET SUBJECTS' whereabouts and intentions, tactics can be employed to minimize the TARGET SUBJECTS' awareness of surveillance and therefore be more productive.

**Undercover Agents**

92.   Due to the resistance to associate themselves with a subject from outside of the DTO, any efforts to attempt to utilize an undercover agent pose a significant risk to the safety of the officer.  Additionally, the EPD&VCTF has conducted multiple controlled purchases of narcotics from members of this DTO utilizing confidential informants who have established historical relationships with target subjects in this investigation.  As the confidential informants developed by the EPD&VCTF have been effective in purchasing narcotics from members of the DTO, they have not been able to discuss information with the target subjects which would accomplish the goals of this investigation.  Specifically, the target subjects have not shown a willingness to discuss stash house locations, methods being utilized to conceal drug proceeds, methods of trafficking the narcotics into West Virginia, or the hierarchy of the DTO as it relates to West Virginia and other states where members of this DTO may reside.  I do not believe that the use of undercover law enforcement agents, can achieve the goals of this investigation.

**Search Warrants**

93.   Search warrants have been attempted in this investigation and have failed to fulfill the goals of this investigation.  Specifically, the EPD&VCTF have executed a search warrant for the Facebook page utilized by CHRISTIAN.  This search warrant revealed several members of the DTO.  This search warrant has proven that CHRISTIAN is utilizing Facebook Messenger to distribute drugs throughout the NDWV.  The messages detail meeting locations and amounts of narcotics being distributed as well as who CHRISTIAN is meeting at these locations.  This search warrant has further proven that CHRISTIAN (**FB1**) communicates with JACKSON (**FB2**) and are working together to distribute

drugs throughout the NDWV. Although the Facebook search warrant results revealed drug distribution and possible transferring of firearms, this information is not an adequate substitute for real-time interception.

94.    On January 8, 2020, the EPD&VCTF sought and obtained a GPS geolocation search warrant in the Northern District of West Virginia (3:20MJ3) for CHRISTIAN's cell phone (**TP1**). The GPS locations received from **TP1** although useful in monitoring the general location of CHRISTIAN's phone, fail to provide investigators with the nature or purpose of travel to specific locations. Additionally, the locations provided often times have a margin of error that places the phone (**TP1**) within an area that is too large for investigators to locate CHRISTIAN in a timely manner and observe meeting locations or persons he meets with.   Physical surveillance coordinated with GPS geolocation information from **TP1** has revealed that CHRISTIAN has traveled several times to Capitol Heights, Maryland and then back to Martinsburg, West Virginia. However, this information does not allow investigators to determine the nature of the meetings between CHRISTIAN and the unidentified TARGET SUBJECT(S) located in Capitol Heights, Maryland or allow investigators to accomplish the goals of this investigation and dismantle the DTO.

95.    Investigators have obtained a search warrant for a GPS tracker for **TV1**. Although the GPS is accurate and investigators are able to observe the exact location of CHRISTIAN and/or JACKSON when they travel, it fails to give a reason for the travels and the identity of whom CHRISTIAN and/or JACKSON are meeting. The GPS tracker warrant has failed to fulfill the goals of this investigation. Investigators will continue to use this GPS tracker during this investigation as it has been useful in giving the exact whereabouts of CHRISTIAN and/or JACKSON.

96.  In addition, using subpoenas or warrants to compel the service provider to obtain stored copies of previously sent or received electronic communications is not an adequate substitute for real-time interception. The service providers do not retain historical copies of the electronic communications and as such, real time interception of electronic communications is necessary to allow investigators to make timely use of the information that may relate to an imminent delivery of contraband or conduct in furtherance of the TARGET OFFENSES.

97.  On January 25, 2020 at approximately 0600 hours, the EPD&VCTF along with U.S. Marshals Service executed a search warrant at 1209 Grazier St. A second individual associated with the Ranson, West Virginia home invasion was arrested. A search of the residence yielded two separate bags of suspected "molly." The suspected "molly" was taken into the custody of the EPD&VCTF and sent to the DEA Laboratory for analysis. To this date, an analysis has not been returned. The EPD&VCTF also recovered items that were suspected of being used in the home invasion. During this search warrant, investigators also confirmed that DIRTING resides at 1209 Grazier St. Although evidence was collected related to this DTO and possible other crimes, this information does not allow investigators to determine the hierarchy of the DTO or allow investigators to accomplish the goals of this investigation and dismantle the DTO.

98.  On March 20, 2020, the EPD&VCTF sought and obtained a vehicle tracker warrant for **TV2** through the NDWV under case number 3:20-MJ-15 signed by Federal Magistrate Trumble. Investigators are still attempting to find a suitable location to install the tracker.

## Interviews/Grand Jury Subpoenas/Immunity

99. Interviews have been conducted during the course of the investigation that have been effective in gathering information on the membership and operation of the DTO. Some of the interviews have also led to the recruitment of a few of the aforementioned confidential source who has been used during this case. However, as described above, this confidential source has taken this investigation as far as it can go, and it is short of meeting the investigation's prosecutorial goals and objectives. Additionally, other attempts at interviewing DTO members have proven entirely futile.

100. After the arrest of BROWN in June 2019, TFOs traveled to the Eastern Regional Jail (ERJ) and attempted to interview BROWN in reference to the distribution of drugs to CASE and the murder investigation. During the interview BROWN refused to cooperate and at one point turned around and faced the opposite direction. This interview failed to further this investigation. Due to the close relationship with BROWN and CHRISTIAN, no further attempts to interview BROWN were attempted due to the risk of jeopardizing the investigation.

101. On October 24, 2019, the Eastern Regional Jail informed investigators that ENGLE had brought drugs in to the facility. The investigators were provided the drugs seized from ENGLE. Investigators interviewed ENGLE who advised that she transported "molly" into the jail and that it was recovered by the jail staff. ENGLE advised she received the "molly" from CHRISTIAN at the Knights Inn motel the day before she was arrested (Engle was referring to October 22, 2019). This day, October 22, 2019, was the same day as the attempted controlled purchase by CI-BLUE from ENGLE. ENGLE advised she received 3 grams of "molly" from CHRISTIAN. ENGLE further advised she received 18 grams of "molly" from JACKSON at the gas station across from the jail (ENGLE is

referring to the aforementioned law enforcement-controlled purchase that took place on October 18, 2019 with JACKSON). ENGLE advised she has received three eight-balls, which is drug terminology to represent 10.5 grams of "molly" from CHRISTIAN on previous dates.

102. Attempting to interview additional persons associated with this investigation would also have the effect of alerting the TARGET SUBJECTS and others, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence. Additionally, if the TARGET SUBJECTS are alerted to the government's investigation, they may flee the jurisdiction in order to avoid apprehension and prosecution.

103. Based upon my training and experience, I do not believe a Grand Jury investigation using subpoenas would be successful for the following reasons:

    a.     subjects of the investigation, such as CHRISTIAN, ENGLE, JACKSON, and REDMAN, if called to testify, would most likely invoke their Fifth Amendment privileges;

    b.     it would likewise be unwise to seek Grand Jury immunity for any of the subjects as it might foreclose prosecution of the most culpable people; and

    c.     most of the individuals who have been identified in this investigation participate in various forms of illegal activities and would likely lie under oath unless confronted with facts that would force them to tell the truth.

104. Currently, I am not aware of any person who could be subpoenaed before the Grand Jury or interviewed who would provide significant and truthful evidence to prove the on-going suspected crimes identified in this affidavit. Moreover, the use of Grand Jury techniques, like search warrants described above, would alert CHRISTIAN, JACKSON and their co-conspirators, both known and unknown, to the existence of this investigation. At a minimum, this would lead CHRISTIAN and his co-conspirators to be more circumspect in their dealings. Thus, I believe that these techniques, in particular, are likely to impede the government's investigative objectives at this time.

### Trash Searches

105. EPD&VCTF investigators did not attempt to conduct a trash pull at CHRISTIAN and JACKSON's residence for reasons similar to those noted in the difficulty in conducting physical surveillance of the residence. CHRISTIAN and JACKSON's residence has a doorbell style camera which has a view on the driveway and front portion of his residence. Although it is common for individuals to set the motion detection on these style cameras closer towards the residence to reduce the amount of data stored from vehicles traveling on the roadways, it is impossible for investigators to know where the motion detector range limit set to. CHRISTIAN and JACKSON's trash cans are located in an area where attempting to retrieve the trash would require investigators to alert the doorbell camera and risk detection. Furthermore, trash searches are not effective in fully identifying the participants and scope of a narcotics conspiracy. Narcotics trafficking is not a document intensive crime, so although trash searches may reveal the phone numbers and monikers of some conspirators, or the occasional writing related to the finances behind a particular drug transaction, they will not fulfill the goals of this investigation. For these reasons, along with the aforementioned complications associated with the

location where CHRISTIAN and JACKSON reside, a trash search was not attempted.

106. The possible source of supply located in the Capitol Heights, Maryland apartment complex utilizes a community dumpster. The dumpster is in close proximity to the target's location. The dumpster was overflowing at the time of observation making it impossible to load all the trash to search or identify if it came from the target's location.

### Attempted Use of Other Surveillance Techniques

107. On January 8, 2020, the EPD&VCTF sought and obtained a GPS geolocation search warrant in the Northern District of West Virginia (3:20MJ3) for CHRISTIAN's cell phone (**TP1**). The GPS locations received from **TP1**, although useful in monitoring the general location of CHRISTIAN's phone, fail to provide investigators with the nature or purpose of travel to specific locations. Additionally, the locations provided often times have a margin of error that places the phone (**TP1**) within an area that is too large for investigators to locate CHRISTIAN in a timely manner and observe meeting locations or persons with whom he meets with. Physical surveillance coordinated with GPS geolocation information from **TP1** has revealed that CHRISTIAN has traveled several times to Capitol Heights, Maryland and then back to Martinsburg, West Virginia. However, this information does not allow investigators to determine the nature of the meetings between CHRISTIAN, JACKSON, and the unidentified TARGET SUBJECT(S) located in Capitol Heights, Maryland or allow investigators to accomplish the goals of this investigation and dismantle the DTO.

Case 3:20-mc-00032-GMG *SEALED*   Document 1-1   Filed 04/15/20   Page 70 of 81   PageID #: 87

108. On January 9, 2020, the EPD&VCTF obtained a vehicle tracker for the vehicle being utilized by CHRISTIAN and JACKSON, a 2008 Chevrolet Equinox bearing West Virginia registration 44H648 (**TV1**) and registered to BROWN, in the Northern District of West Virginia in case number 3:20-MJ-2. The GPS locations identified CHRISTIAN traveling to Capital Heights, Maryland and then to Winchester, Virginia. After he would travel to these locations, he would then make multiple stops throughout the Northern District of West Virginia. Although, the tracker has been able to identify locations, it has failed to identify the true reason for the trip. The tracker also failed to identify exact apartments when the target subject resides in a multi-plex apartment facility. This information does not allow investigators to determine the nature of the meetings between CHRISTIAN and the TARGET SUBJECT located in Capitol Heights, Maryland or allow investigators to accomplish the goals of this investigation and dismantle the criminal enterprise.

109. On January 31, 2020, the EPD&VCTF identified a suitable location for fixed video surveillance at the suspected stash location on Woodstock Lane in Winchester, Virginia. The EPD&VCTF made a request through FBI Pittsburgh to establish fixed video surveillance in front of the Woodstock Lane apartment complex in Winchester, Virginia. The fixed video surveillance unit may allow investigators to observe CHRISTIAN and JACKSON arriving at the apartment complex, entering the target apartment, and at times, meeting with individuals outside of the apartment complex. During times where CHRISTIAN and JACKSON were observed traveling to this location, investigators were not able to confirm the purpose of the meetings, content of the meetings, or allow investigators to accomplish the goals of this investigation and dismantle this organization.

110. On January 29, 2020, the EPD&VCTF utilized aerial surveillance which was able to locate **TV1** in Berkeley County, West Virginia. Aerial surveillance lost

contact with **TV1** due to a technical malfunction with the aerial surveillance camera system. Investigators monitored the GPS tracker for **TV1** and observed it to be traveling south on Interstate 81. Investigators relayed this information to the aerial surveillance. Aerial surveillance was able to locate **TV1** parked at CHRISTIAN's possible stash location in Winchester, Virginia.  By the time aerial surveillance located **TV1** at the possible stash location, **TV1** was leaving the parking lot. Aerial surveillance was unable to observe any individuals going to or from **TV1**. Due to limited supply of fuel, aerial surveillance was forced to refuel which resulted in losing contact with **TV1**. Although beneficial in observing **TV1** parked at the possible stash location, it failed to identify the apartment associated with CHRISTIAN, JACKSON, and the identities of other TARGET SUBJECTS.

111. On February 10, 2020, the EPD&VCTF traveled to Capitol Heights, Maryland to a possible location of CHRISTIAN and JACKSON's source of supply. Investigators were unable to identify a known vehicle associated to a resident of the target location. Also, EPD&VCTF requested a site survey to be conducted in order to place a fixed camera location. It appeared the location would be difficult to install a fixed camera. The apartment complex is adjacent to an elementary school in which the parking lots are separated by a metal fence.

112. On February 20, 2020, investigators monitored the GPS tracker installed on **TV1**. Investigators observed **TV1** traveling towards the Maryland area via Route 7. Investigators notified Maryland law enforcement to assist with surveillance when **TV1** arrived at the Capitol Heights, Maryland location. Maryland law enforcement established a fixed surveillance location and observed **TV1** arrive at the apartment complex. Maryland law enforcement observed the passenger exit and identified him as CHRISTIAN. Surveillance units identified JACKSON as the driver of **TV1**. CHRISTIAN and JACKSON entered the apartment building with the address of 6988 Walker Mill Rd.

71

Maryland law enforcement could not determine which apartment CHRISTIAN and JACKSON entered or who they were interacting with at the apartment complex. This was due to the complex having one central door which gives a visitor access to multiple units after entering this door. It was believed if the surveillance units followed CHRISTIAN and/or JACKSON into the complex, it may compromise this investigation. It is believed, as previously noted, this is believed to be a re-supply or stash location. It is believed with the authorized interception of **TP2**, **FB1**, and **FB2** investigators will be able to fully identify the reason for CHRISTIAN and JACKSON continually arriving at this location.

**Pen Registers, Trap and Trace Devices, Toll Analysis and Subscriber Information**

113.  Court orders have been issued authorizing the installation and use of a pen register and trap and trace device on TARGET TELEPHONES (**TP1**) and (**TP2**) and other telephones related to this investigation. Court orders have been issued authorizing the installation and use of a pen register and trap and trace device on the TARGET FACEBOOK ACCOUNTS, **FB1** and **FB2**. Agents in this investigation will continue to use pen registers, trap and trace devices, and toll record analysis during this investigation.  Pen register and toll information provide frequency and identifying information regarding calls made from a particular telephone.  This technique, however, will only provide agents with a list of numbers called and will not establish the identities of all the persons called or the contents of the conversations. Moreover, based on my training and experience, I know that narcotics traffickers often subscribe to telephones in fictitious names or use the names of family members and other associates when subscribing to phone service in an effort to thwart law enforcement investigation of their illegal activities.

114.  A trap and trace device is simply a complement of a pen register device.  It identifies the telephone number of any telephone that has dialed the subject

72

phone, but it is also subject to the same limitations of a pen register. For all the reasons stated above, pen register and trap and trace devices and toll analysis are all valuable investigative tools, but will not by themselves achieve the goals of the government's investigation.

## Mail Cover Requests

115. "Mail covers" are a service provided by the United States Postal Service whereby a list of all the sender and receiver names and addresses on each piece of mail received at a particular location can be obtained. The list is compiled by the mail carrier who would deliver the mail to the target location, and then the list would be provided to a United States Postal Inspector, who would provide the list to the EPD&VCTF investigators. At this time, investigators have not developed any intelligence that would give them a reason believe that CHRISTIAN is utilizing a mail service to obtain drugs.

## Other Wiretaps

116. Investigators believed the authorized interception of **TP1** (3:20MC22) would intercept the conversations with CHRISTIAN and/or JACKSON's drug supplier in Capitol Heights, MD and/or Washington DC area and would assist in the identification of these TARGET SUBJECTS. During the beginning of the authorized wire, investigators gained information that CHRISITAN disconnected **TP1** as a reaction to recent events and indictments in Berkeley County, WV. The authorized wire interception of **TP1** has failed to meet the goals of this investigation due to the fact that there have been no interceptions over **TP1** with CHRISTIAN and/or JACKSON's drug supplier. This non use of **TP1** by CHRISTIAN caused JACKSON to utilize **TP2** to make contact with drug customers as noted above in this affidavit. The pen trap and trace order also revealed JACKSON to be in contact with Washington DC phone numbers. This is believed to be the possible supplier of CHRISTIAN and JACKSON. It is

believed CHRISTIAN and JACKSON as of now, have began using **TP2** with **FB1** and **FB2** to facilitate their drug enterprise.

117.    Wire monitors were able to intercept communications over **FB1** and **FB2** where CHRISTIAN and/or JACKSON were communicating with target subjects and arranging the distribution of narcotics. These communications would also provide investigators with meet up locations. Investigators were able to utilize these communications and identify multiple subjects purchasing narcotics from CHRISTIAN and/or JACKSON. JACKSON would also communicate with target subjects over **FB2** and arrange the sale of narcotics when target subjects were not successful with contacting CHRISTIAN over **TP1** and/or **FB1**. **FB1** and **FB2** have also been useful in identifying CHRISTIAN and JACKSON use of **TP2** to complete drug transactions. Communications over **FB1** and **FB2** have confirmed their use of **TP2**.

118.    At times, CHRISTIAN and/or JACKSON would advise individuals over **FB1** and/or **FB2** when they would be traveling out of town. Although CHRISTIAN and/or JACKSON would not directly say they were obtaining drugs, CHRISTIAN and/or JACKSON would advise when they would be back in town to supply drugs to TARGET SUBJECTS. After CHRISTIAN and/or JACKSON would advise they were going out of town, monitors would observe the authorized PEN trap and trace for **TP2** (3:20MC15) and observe **TP2** to be communicating with Capitol Heights, MD and/or Washington, DC TARGET SUBJECTS. Investigators believe the authorized interception of **TP2** would reveal the reasoning for CHRISTIAN and JACKSON's frequent trips to Capitol Heights, MD and Washington, DC and assist in identifying TARGET SUBJECTS.

119. Investigators believe continued interception over **FB1** and **FB2** would give investigators a time frame of CHRISTIAN's and/or JACKSON's traveling and drug distribution and would allow investigators to identify possible target subjects.

120. Wire monitors also intercepted CHRISTIAN and/or JACKSON giving their whereabouts to TARGET SUBJECTS over **FB1** and/or **FB2**. This location information would assist investigators when surveillance has been thwarted.

121. Although beneficial to identifying redistributors of drugs, the authorized interception of **FB1** and **FB2** has failed to meet the goals of this investigation because it has not allowed investigators to identify CHRISTIAN and JACKSON's source of drug supply. Investigators believe the authorized interception of **TP2**, **FB1**, and **FB2** provides the best opportunity to meet the goals of this investigation. The identification of JACKSON communicating with subjects in Washington DC, which is believed to be the location of their source of supply, will provide the best opportunity to confirm this evidence and provide an opportunity to disrupt a supply shipment.

### Financial Investigation

122. Money laundering is not an alleged target offense at this point in the investigation. Investigators are aware that CHRISTIAN and JACKSON make frequent visits to what they believe is his source of supply in Capitol Heights, Maryland. Because this would be an in-person meeting, investigators believe CHRISTIAN and/or JACKSON would have no reason to use any outside source for his drug payment. Investigators feel that interception of his/her voice and electronic communications occurring over **TP2** and contents of **FB1** and **FB2**

would reveal his purpose of travel to the Capitol Heights, Maryland and the nature of the meetings that he has while visiting his suspected supplier.

## MINIMIZATION

123. All interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will terminate upon the authorized objectives or, in any event, at the end of thirty (30) days measured from the earlier of the day on which law enforcement officers first begin to conduct an interception under this Order or ten (10) days after the Order is entered as to TARGET TELEPHONE 2 and the TARGET FACEBOOK ACCOUNTS. Monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the TARGET INTERCEPTEES or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If a conversation has been minimized, the monitoring agents will spot check to ensure that the conversation has not turned to criminal matters. Special attention shall be given to minimize all privileged communications.

124. In the event that an intercepted conversation is in code or foreign language, and an expert in that foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. In the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under

contract with the government, will be under the direct supervision of a federal agent.

125. If, however, a translator is not reasonably available, the following after-the fact minimization procedures have been established, pursuant to Title 18, United States Code, Section 2518(5):

   (a)   all such foreign language conversations will be intercepted and recorded in their entirety;

   (b)   as soon as practicable after such interception, these conversations will be reviewed and minimized by a translator under the guidance of a federal agent authorized to conduct the interception, after which an English translation of the pertinent criminal conversations will be furnished to the supervising federal agent.

126. All monitoring of electronic communications will be conducted in accordance with Chapter 119 of Title 18, United States Code.   Each electronic communication (i.e. text message) will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature. If the message is not criminal in nature, the message will be marked "minimized" and not accessed by other members of the investigative team. If the message appears to be privileged, it will be marked "privileged" and secured from access by other members of the investigative team. If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "non-minimized" and may be shared with the other agents and monitors involved in the investigation.   If a

text message is marked "minimized" or "privileged," it will not be disseminated to members of the investigative team. All intercepted text messages will be sealed with the court upon the expiration of the court's Order authorizing the interception. It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored and read (including those intercepted at hours when the location was not staffed). However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

127.   Electronic communications over the target phone will be intercepted, pursuant to the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. § 1001 et seq., in part through receipt from the service provider of "packet data," an electronic data stream. That packet data stream, pursuant to CALEA, will be delivered to FBI's electronic communications collection system, and when certain technology (including VoIMS, VoLTE, 4G, and others) is employed by the cellular service provider, that packet data stream will include a complete copy of all voice calls (which are wire communications) occurring over the target phone. Those voice calls in the packet data stream are duplicates of wire communications that may be intercepted through FBI's wire communications collection system and minimized in real-time. The packet data, including the copies of voice calls, cannot be minimized in real-time. Therefore, FBI will utilize a filter program in its electronic communications collection system that will automatically identify and block voice calls (which are wire communications) from being intercepted by filtering them out of the electronic communications packet data stream before they enter the electronic communications collection system and are recorded. In the rare event that a voice call is not filtered out of the packet data stream and is recorded, the call will not be monitored or otherwise accessed through the electronic communications presentation system, and FBI will preserve and seal such

communications in the manner used for other intercepted electronic communications.

## GEOLOCATION INFORMATION

128.  In addition, there is probable cause to believe that the location of TARGET TELEPHONE 2 (**TP2**) at times determined by investigators during the authorized period of interception, and information regarding the location of TARGET TELEPHONE (**TP2**) during the 60 days preceding the date that the order is entered (the "Requested Location Information"), will constitute evidence of the TARGET OFFENSES.

129.  EPD&VCTF investigators have yet to determine CHRISTIAN and JACKSON's travel routines throughout the Eastern Panhandle of West Virginia. As stated previously, knowledge of the location of **TV1** or **TV2** does not necessarily give the location of CHRISTIAN and/or JACKSON but only the location CHRISTIAN and/or JACKSON travel to while utilizing **TV1** or **TV2**. Furthermore, prospective (real-time) location information provided by the service providers would allow investigators to monitor CHRISTIAN and JACKSON's movement in and around Berkeley and Jefferson Counties, while not utilizing **TV1** or **TV2**, in an effort to develop possible "stash house" locations, proximity to gang-related violent acts that occur, or meeting locations where the DTO conducts drug resupply activity.

130.  Probable cause exists for the acquisition of prospective (real-time) location information as evidenced in the multiple controlled purchases of "boot" (also known as "molly"/MDMA) conducted by the EPD&VCTF from CHRISTIAN. The captioned controlled drug buys have demonstrated CHRISTIAN's ability to acquire large redistributable quantities of "boot" from a source that has yet to be identified.    Investigators are aware that CHRISTIAN is from the

Washington, D.C. area and has family connections to the region.   Due to JACKSON contacting the TARGET SUBJECTS, it is believed prospective (real-time) location information obtained from JACKSON'S TARGET TELEPHONE (**TP2**) would allow investigators to obtain information regarding her route of travel and destination of travel.

## JURISDICTION

131. Pursuant to 18 U.S.C. § 2518(3), in the event that the TARGET TELEPHONE (**TP2**) and/or the TARGET FACEBOOK ACCOUNTS (**FB1**) and (**FB2**) are used outside the territorial jurisdiction of this Court, interceptions may continue in the Northern District of West Virginia, where communications over the TARGET TELEPHONE (**TP2**) and/or TARGET FACEBOOK ACCOUNTS (**FB1**) and (**FB2**) will first be heard and/or read and minimized.

## CONCLUSION

132. Based upon my training and experience, including my participation in this investigation, I believe that probable cause exists that the TARGET SUBJECTS and others known and unknown are involved in a continuing criminal conspiracy involving narcotics trafficking. As detailed above, normal investigative techniques have yielded limited success with regards to identifying all the members of the DTO, including suppliers and customers of the DTO throughout the Eastern Panhandle of West Virginia area, as well as in other states. Therefore, interception over the TARGET TELEPHONE (TP2) and TARGET FACEBOOK ACCOUNTS is necessary and permission is hereby requested to initiate the interception of wire and electronic communications of the TARGET SUBJECTS, and any other co-conspirators later identified, over the TARGET TELEPHONE (TP2) and electronic communications of TARGET SUBJECTS, and any other co-conspirators later identified, over the TARGET FACEBOOK ACCOUNTS.

TFO Mathew Custer
EPD&VCTF
Ranson Police Department

Subscribed and sworn to before me, this 15th day of April, 2020,

UNITED STATES DISTRICT COURT JUDGE



**U.S. Department of Justice**

Criminal Division

_Washington, D.C. 20530_

April 14, 2020

<u>MEMORANDUM</u>

TO:      J. Robert Bryden, Director
              Office of Enforcement Operations
              Criminal Division

ATTN:    Lara Omps-Botteicher

FROM:    Brian A. Benczkowski
              Assistant Attorney General
              Criminal Division

SUBJECT: Authorization for Interception Order Application


    This is with regard to your recommendation that an appropriately designated official of the Criminal Division authorize an application to a federal judge of competent jurisdiction for an order under Title 18, United States Code, Section 2518, authorizing for a thirty (30) day period the initial interception of wire communications occurring to and from the cellular telephone bearing the number (540) 327-0261, subscribed to by Misty Jackson, 1084 S. Laurel Road, London, Kentucky, and accessed through International Mobile Subscriber Identity ("IMSI") number 312530013954685, in connection with an investigation into possible violations of Title 21, United States Code, Sections 841, 843, and 846, and Title 18, United States Code, Section 1952, by Michael Christian, Misty Jackson, Michael Brown, Michael Moody, Samantha Engle, Michael Pendleton, William Redman, Shane Dirting, Joshua Runkles, Justin Clinton, Jaime Coddington, Keonta Frye, "Unsub 6345," and others as yet unknown.

    By virtue of the authority vested in the Attorney General of the United States by Section 2516 of Title 18, United States Code, the Attorney General has by Order Number 4417-2019, dated March 25, 2019, designated specific officials in the Criminal Division to authorize applications for court orders authorizing

the interception of wire or oral communications.  As a duly
designated official in the Criminal Division, this power is
exercisable by the undersigned.  WHEREFORE, acting under this
delegated power, the appropriately designated official
authorizes the above-described application to be made by any
investigative or law enforcement officer of the United States as
defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to
the target telephone number listed above, but also to any other
telephone number or telephone accessed through the above-
referenced IMSI number, and to any other IMSI number accessed
through the target telephone number referenced above, within the
thirty day period.  The authorization is also intended to apply
to the target telephone number referenced above regardless of
service provider, and to background conversations intercepted in
the vicinity of the target telephone while the telephone is off
the hook or otherwise in use.


_____
John P. Cronan
Deputy Assistant Attorney General
Criminal Division


April 14, 2020

_____
Date

2



**U.S. Department of Justice**

Criminal Division

*Washington, D.C. 20530*

April 14, 2020

William J. Powell
United States Attorney
Northern District of West Virginia
Wheeling, West Virginia

Attention:    Lara Omps-Botteicher
              Assistant United States Attorney

Dear Mr. Powell:

An appropriate official hereby approves an application to be made to a federal judge of competent jurisdiction for an order under Section 2518 of Title 18, United States Code, authorizing for a thirty (30) day period the continued interception of electronic communications to and from the Facebook accounts bearing the identification numbers 100000756809234 and 100003308781682, and initial interception of electronic communications occurring to and from the cellular telephone number bearing the number (540) 327-0261, subscribed to by Misty Jackson, 1084 S. Laurel Road, London, Kentucky, and accessed through International Mobile Subscriber Identity ("IMSI") number 312530013954685, in connection with an investigation into possible violations of federal felonies, by Michael Christian, Misty Jackson, Michael Brown, Michael Moody, Samantha Engle, Michael Pendleton, William Redman, Shane Dirting, Joshua Runkles, Justin Clinton, Jaime Coddington, Keonta Frye, "Unsub 6345," and others yet unknown.

The above-described application may be made by you or any other attorney on your staff who is an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through the target telephone number referenced above, within the thirty day period.  The authorization is also intended to apply to the target telephone number referenced above regardless of service provider.

Sincerely,

_____
John P. Cronan
Deputy Assistant Attorney General
Criminal Division


April 14, 2020

_____
Date

4